**Denise TRAVIS, Plaintiff–Appellee,**

v.

**GARY COMMUNITY MENTAL HEALTH CENTER, INC., et al., Defendants–Appellants.**

**No. 90–1412.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1990.

Decided Dec. 27, 1990.

Rehearing and Rehearing Denied Jan. 31, 1991.

Ivan E. Bodensteiner, Valparaiso, Ind., for plaintiff-appellee.

Douglas M. Grimes, Gary, Ind., for defendants-appellants.

Before BAUER, Chief Judge, and CUDAHY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Elliott Cunningham filed suit contending that the Gary Community Mental Health Center, Inc., had not afforded him promised vacation, sick, and holiday pay, and had retaliated against him when he invoked his rights under the Fair Labor Standards Act. The FLSA forbids retaliation. 29 U.S.C. § 215(a)(3). Cunningham subpoenaed Denise Travis, his immediate supervisor, to be a witness at trial. Travis's testimony was helpful to Cunningham, who prevailed. Within the month, the Center fired both Cunningham and Travis. Travis was on leave expecting a child; the Center demanded that she immediately return her medical insurance card. At the trial in this case a witness explained that Travis was cast out because "she had cost us money". The jury concluded that Travis was the victim of retaliation. She received about $83,000 in damages plus $21,000 in attorney's fees. We must decide whether the remedy is authorized by law. (Defendants' challenge to the verdict was not argued in the opening brief and is waived.)

Instead of standing on § 215(a)(3), Travis put most of her reliance on 42 U.S.C. § 1985(2), which creates a remedy:

> If two or more persons ... conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified....

Section 1985(2), unlike § 215(a)(3), requires proof of a conspiracy. Travis found the plurality of actors in the managers of the Center. She named as defendants three of the Center's senior executives: Charlie Brown, its Executive Director; Kenneth R. Phillips, its Director of Administration; and Wendell P. Robinson, its Director of Clinical Services. Brown, Phillips, and Robinson discussed discharging Travis, and Brown instructed Phillips to prepare the letter conveying the news.

This intra-corporate conspiracy approach runs smack into *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir.1972) (Stevens, J.), which held that the conspiracy requirement in § 1985(3) "is not satisfied by proof that a discriminatory business decision reflects the collective judgment of two or more executives of the same firm." Travis asks us to distinguish or limit *Dombrowski*. Whittling away at a case is more attractive if its core principle is wrong than if it is right, for why strain to curtail the application of sound rules? Travis therefore reminds us that *Dombrowski* has not won universal approbation and invites us to rethink the subject.

■ Two rhetorical questions frame the dispute. (1) Why should action by a single employer be covered by § 1985 just because discussions among the firm's multiple agents precede decision? (2) Why should decisions taken by a plurality of actors be immune from check under § 1985 just because they take the trouble to incorporate? Which question you pose largely determines the outcome. It is therefore not surprising that courts have reached disparate conclusions. Courts aligned with *Dombrowski* include *Girard v. 94th Street & Fifth Avenue Corp.*, 530 F.2d 66, 70–71 (2d Cir.1976), reaffirmed in *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir.1978); *Buschi v. Kirven*, 775 F.2d 1240, 1251–53 (4th Cir.1985); *Doherty v. American Motors Corp.*, 728 F.2d 334, 339–40 (6th Cir. 1984); and *Cross v. General Motors Corp.*, 721 F.2d 1152, 1156 (8th Cir.1983), reaffirmed in *Bond v. IMFS, Inc.*, 727 F.2d 770 (8th Cir.1984). Courts that come out the other way include *Stathos v. Bowden*, 728 F.2d 15, 20–21 (1st Cir.1984); *Novotny v. Great American Federal Savings & Loan Ass'n*, 584 F.2d 1235, 1256–59 (3d Cir.1978) (in banc), reversed on other grounds, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); and *United States v. Hartley*, 678 F.2d 961, 970–72 & n. 14 (11th Cir.1982). Which is the *right* question to ask depends on the function of the statute.

Section 1985 descends from the Civil Rights Act of 1871, commonly known as the Ku Klux Klan Act. *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), recounts its background. See also *United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). The Radical Republicans in Congress wanted to put down the Invisible Empire, whose night riders were terrorizing the newly freed blacks and their white supporters. Congress was concerned not about unilateral action but about organized, almost society-wide resistance to emancipation and civil rights. Fear of violence (a theme running through the text of and debates on the 1871 act) could unite disparate centers of influence, closing opportunities to the freed men. Bigoted acts by a single firm, acting independently, pose risks of lesser caliber.

When Congress drafted § 1985 it was understood that corporate employees acting to pursue the business of the firm could not be treated as conspirators. Courts looked past the individual acts to concentrate on the collective decision. E.g., *Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 636, 4 L.Ed. 629 (1819). Long before Congress enacted § 1985, Blackstone remarked that the corporation and its managers are "considered as one person in law". William Blackstone, 1 *Commentaries on the Laws of England* *456 (1st ed. 1765). Neither the text and structure nor the background of § 1985 imply a decision to discard this understanding, which remains the accepted wisdom. E.g., 10 *Fletcher Cyclopedia of the Law of Private Corporations* § 4884 (Lenore M. Zajdel ed. 1986). Intra-corporate dealings under § 1985 therefore should receive the same treatment as intracorporate dealings under the Sherman Act, enacted 19 years later with similar inattention to such details. See *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). *Copperweld* emphasizes that the antitrust laws aim at preserving independent economic decisions, which supposes cooperation inside economic entities—cooperation that cannot be called "conspiratorial" without defeating the foundation of competition. Similarly, § 1985 aims at preserving independent decisions by persons or business entities, free of the pressure that can be generated by conspiracies, and again intra-corporate discussions lie outside the statute's domain.

Remaining doubts we resolve by reference to the principle of *Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366, 375–78, 99 S.Ct. 2345, 2350–52, 60 L.Ed.2d 957 (1979), that § 1985 and other statutes of its time should not be read so broadly that they occupy the territory of more recent civil rights laws, providing remedies without the limitations and qualifications Congress introduced when it addressed the question explicitly. See also, e.g., *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 2374–75, 105 L.Ed.2d 132 (1989). The FLSA deals with the subject of this suit and prohibits the Center's conduct; Travis added a claim under § 1985(2) only to escape what she feared would be limitations on the remedy under § 215(a)(3). *Novotny, Patterson*, and other cases counsel against such a use of the Civil War statutes.

Note an important limitation of the principle in *Dombrowski:* members of the Ku Klux Klan could not avoid liability by incorporating, for they would still be trying to organize (through persuasion or terror) multiple centers of social or economic influence. *Dombrowski*, 459 F.2d at 196. The Klan meddled in the business of others; that is what made it dangerous. The Center minded its own business. None of this, moreover, denies that corporate officers are answerable for their own crimes and torts. All *Dombrowski* concluded, and all we reiterate, is that managers of a corporation jointly pursuing its lawful business do not become "conspirators" when acts within the scope of their employment are said to be discriminatory or retaliatory.

Having reexamined the foundation for the conclusion that discussions of corporate business among corporate executives are not "conspiracies", we are ready to address Travis's proposed limitations. One is that

*Dombrowski*'s approach should not be "extended" from § 1985(3) to § 1985(2). Nothing in the rationale of *Dombrowski* is lashed to a particular clause of the Civil Rights Act of 1871, and there is no sound reason to drive a wedge between its sections. A second distinction is that, before firing Travis, the executives of the Center consulted with Douglas M. Grimes, its outside counsel. Although Grimes was not an employee of the Center, this does not create a conspiracy. In the end the Center took the decision to fire Travis; only one economic entity participated. If consultation with counsel could create a conspiracy, then *Copperweld* would be a hollow decision, avoidable whenever the corporation discusses its business plans with lawyers, accountants, or other advisers—as all do. Treating involvement of a lawyer as the key unlocking § 1985 would discourage corporations from obtaining legal advice before acting, hardly a sound step to take. *Doherty*, 728 F.2d at 340.

Travis's final proffered limit is that corporate managers become conspirators when they engage in multiple discriminatory (or retaliatory) acts. Some language in *Volk v. Coler*, 845 F.2d 1422, 1434–36 (7th Cir.1988), as in *Dombrowski* itself, 459 F.2d at 196, supports this proposal. Yet such a line responds neither to the text nor to the objectives of § 1985. Section 1985 depends on multiple act*ors*, not on multiple *acts* of discrimination or retaliation. Sequences such as first chastising an employee and then firing him are neither better nor worse (so far as the objectives of § 1985 are concerned) than is a clean act of discharge. A single corporate executive who made multiple decisions would not be a "conspiracy"; why then would two discriminatory or retaliatory acts approved by a plurality of corporate executives be a conspiracy, if a single act by the same executives is not? We do not think the distinction tenable if the foundation of *Dombrowski* is sound. Judge Manion, concurring in *Volk*, observed that the discussion of *Dombrowski* in the majority's opinion is dicta. 845 F.2d at 1439. Now that the question has been presented for decision, we conclude that it does not matter whether the corporate managers took multiple steps to carry out their plan; intracorporate discussions are not "conspiracies".

[2] Travis's relief depends, then, on the FLSA. Most of the award ($45,500) represents punitive damages, and another $35,000 is compensation for emotional distress attributable to the discharge and revocation of health insurance while Travis was on leave to receive medical care for complications in her pregnancy. She suffered little loss in wages, because the firing caused such a ruckus within the Center that its managers reinstated her within two months. At oral argument, Travis's lawyer candidly remarked that he pursued the claim under § 1985(2) because, he believed, decisions of the Supreme Court limited the availability of compensatory and punitive damages under the FLSA. So they did, once upon a time, but the landscape changed in 1977.

As enacted in 1938, the FLSA established as remedies the statutory wages and overtime compensation plus "an additional equal amount as liquidated damages" plus attorneys' fees. 29 U.S.C. § 216(b). Compensatory and punitive damages were unavailable. Congress amended the remedial section by adding this language: "Any employer who violates the provisions of section 15(a)(3) of this Act [29 U.S.C. § 215(a)(3) ] shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 15(a)(3), including without limitation employment, reinstatement or promotion and the payment of wages lost and an additional equal amount as liquidated damages." Pub.L. 95–151, 91 Stat. 1252 (1977). This amendment authorizes "legal" relief, a term commonly understood to include compensatory and punitive damages.

Because the original text prescribed as a remedy double the shortfall of wages, and the amendment says that damages include this "without limitation", Congress has authorized other measures of relief. Which other forms? The answer has been left to the courts. We could not find any case interpreting this amendment. The legisla-

**112**

tive history is unhelpful. The language originated in the Senate; the committee report does not discuss it. The Conference Committee adopted the Senate's proposal, remarking that the bill authorizes suits "for appropriate legal or equitable relief" without describing what relief might be "appropriate". H.R.Conf.Rep. No. 95–497, 95th Cong., 1st Sess. 16 (1977).

Appropriate legal relief includes damages. Congress could limit these damages, but the 1977 amendment does away with the old limitations without establishing new ones. Compensation for emotional distress, and punitive damages, are appropriate for intentional torts such as retaliatory discharge. So although § 1985(2) does not support the jury's award, § 216(b) does. Fed.R.Civ.P. 54(c) requires courts to award the relief to which the prevailing party is entitled, even if that party did not request the relief or relied on the wrong statute. Misplaced reliance on § 1985(2) does not undercut the verdict; § 216(b) supplies all the authority the district court required.

AFFIRMED.