Hermene HARTMAN, Plaintiff–Appellant,

v.

The BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 508, COOK COUNTY, ILLINOIS; Reynaldo Glover; and Nelvia Brady, Defendants–Appellees.

No. 91–3775.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 12, 1992.

Decided Aug. 18, 1993.

Rehearing Denied Nov. 4, 1993.

466

Thomas H. Geoghegan, Leon M. Despres, R. Edward Wilhoite, Jr. (argued), Despres, Schwartz & Geoghegan, Chicago, IL, for plaintiff-appellant.

Hugh R. McCombs, Jr., David B. Ritter, Michael J. Gill, Bettina Getz (argued), Mayer, Brown & Platt, Chicago, IL, for defendants-appellees.

Before MANION and ROVNER, Circuit Judges, and REYNOLDS, Senior District Judge.[1]

REYNOLDS, Senior District Judge.

Hermene Hartman ("Hartman"), formerly a Vice Chancellor of the City Colleges of Chicago ("City Colleges"), claims she was demoted from that position, in violation of 42 U.S.C. §§ 1983 and 1985(3), because of her objections to various forms of improper be-

havior on the part of her superiors. The district court granted summary judgment for defendants-appellees ("defendants") the Board of Trustees of Community College District No. 508, Cook County, Illinois ("the Board of Trustees"), Reynaldo Glover ("Glover"), and Nelvia Brady ("Brady"). For reasons stated below, we affirm.

## I. Background

### A. Facts[2]

In 1973, City Colleges, a public institution governed by the Board of Trustees, hired Hartman to teach at City–Wide College, one of its eight Chicago colleges. She was tenured in 1976, and appointed special assistant to the City Colleges Chancellor in 1984. In 1988, Brady, then the City Colleges Chancellor and chief executive officer, appointed Hartman Vice Chancellor for External Affairs. Hartman's duties in that position included oversight of a program called "Caravan to Knowledge," aimed at recruiting students from housing projects operated by the Chicago Housing Authority ("CHA"). The program was developed by Glover, then Chairman of the Board of Trustees.

In November 1988, according to Hartman's verified complaint, Brady and Glover directed her not to send the Caravan into Latino communities outside of CHA neighborhoods, saying, "we don't like the Beaners." (Rec. 1 at ¶ 11.) Hartman says she objected to the use of that term and "insisted" that the Caravan program not be limited in that way. In 1988, the program eventually visited all CHA sites, but did not visit other neighborhoods. In a December 1, 1988 report to Brady, however, Hartman called the program an "overwhelming success" and raised no objection to its limited scope. (Rec. 79 at ¶ 11.) When the program was repeated in 1989, it was again limited to CHA housing, but apparently without any further objection from Hartman.

Hartman further claims that in 1989, Glover repeatedly asked her to help him obtain

---

1. The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, sitting by designation.

2. What follows is taken from the parties' summary judgment materials and from Hartman's verified amended complaint.

sexual favors from other women, including other City Colleges employees, calling it a privilege of his position. Hartman says she told Glover that such requests were an "abuse of power," that they would get him "in a lot of trouble," and that he was "not acting as a chairman of the board." (Rec. 94, Ex. 7 at 264.) In addition, Hartman says, she and another employee informed Brady of Glover's behavior, telling her that they found it "very improper," that they were "sick of being pressured by it" and that they "thought that [Glover] was going to get himself in an awful lot of trouble." (*Id.*) Hartman claims she also mentioned this problem to her mother, a boyfriend, and two co-workers, but she does not recall the details of those conversations.

Hartman also claims that in January 1989, Brady and Glover asked her to portray Board of Trustees member Robert Weissbourd as a racist, and that in April 1989, Brady asked Hartman to make disparaging public statements about Brady's former husband. Hartman says she refused and objected to both requests and told a few coworkers, friends, and relatives about them, although she does not recall the detail or substance of those conversations.

Finally, Hartman claims that between April 1988 and April 1989, Brady, Glover, or both, issued, and Hartman "refused" to comply with, the following instructions: that Hartman direct all City Colleges vice chancellors and presidents not to make statements to the media; that she issue statements in support of Glover's campaign for public office; that she issue a press release falsely stating that City Colleges' enrollment had increased by ten percent; that she hire a certain person without following the necessary search and interview procedures; that she make "illegal purchases" from a business owned by Brady's brother; and that she initiate a smear campaign against a ` City Colleges vice chancellor.

Hartman revealed none of this, however, in an interview with a reporter for the *Chicago Defender,* which published a report on April 24, 1989, stating in part:

> Hartman praised Atty. Reynaldo Glover and Dr. Nelvia Brady, chairman of the board of Trustees and chancellor of City Colleges, respectively. She said CCC has the "most active, involved board" than in its history.
>
> "We have to take education to the people, so Brady and Glover are like a 'breath of fresh air,'" Hartman stated. "The things I am doing now, I've wanted to do for a very long time.
>
> This is the first time that I'm being supported and given the resources to implement. While the national trend is downward for enrollment, our enrollment is up."

(Rec. 79 at ¶ 17.) Hartman does not dispute the accuracy of this report.

On July 17, 1989, Brady placed Hartman on administrative leave with full pay and benefits, explaining that her position was to be eliminated and that she was to be returned to a tenured faculty position. On August 3, 1989, the Board of Trustees approved Brady's recommendation that Hartman be reassigned to her present position, an associate professorship at Truman College, which pays substantially less than her former position. That position was eliminated sometime after Hartman's reassignment.

### B. District Court Proceedings

Hartman filed her verified amended complaint on October 9, 1990, raising a number of claims stemming from her demotion, two of which are at issue on appeal. The first is that by refusing to send the Caravan program to Latino neighborhoods outside of CHA properties, Brady and Glover conspired to discriminate against Latinos in violation of the Civil Rights Act (or Ku Klux Klan Act) of 1871, 42 U.S.C. § 1985(3), and then demoted Hartman for opposing the conspiracy.[3]

---

**3.** Section 1985(3) provides in pertinent part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immuni-

ties under the laws ... if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of

Defendants challenged this claim on the ground that their actions were protected by absolute or qualified immunity and on the ground that intracorporate action such as that involved in the administration of the Caravan program cannot form the basis of a conspiracy under § 1985(3). The district court's decision rested, however, on neither ground. Instead, the court dismissed the conspiracy claim for the distinct reason that Hartman had not identified "specific facts" in support of the claim, other than those alleged in her amended complaint. *See* Fed.R.Civ.P. 56(e).

Hartman's second claim, brought pursuant to 42 U.S.C. § 1983, is that Brady, Glover, and the Board of Trustees demoted her in retaliation for her objections to discrimination against Latinos, to Brady's and Glover's use of racist language, to Glover's sexist behavior, and to the various other instructions or requests described above. The district court dismissed the retaliation claim on the ground that Hartman had failed to show that her objections or refusals raised a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

## II. Analysis

*A. The § 1985(3) Claim*

■ To prevail under § 1985(3), a plaintiff must prove, first, that the defendants conspired; second, that they did so for the purpose of depriving any person or class of persons of the equal protection of the laws; and third, that the plaintiff was injured by an act done in furtherance of the conspiracy. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). The district court's decision rested on Hartman's failure to adduce specific facts supporting the second and third elements of the claim.

the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

4. *Accord: Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir.1985); *Doherty v.*

■ The difficulty with this rationale is that defendants never actually challenged the factual foundation of the claim; they did not dispute Hartman's assertions that she was fired for objecting to the limited scope of the Caravan program and that the program was operated in a discriminatory manner. Rather, defendants' position was that even if all that were true, still, as a legal matter, Hartman could not recover from them under § 1985(3). Because defendants' arguments did not attack the factual predicate of Hartman's claim, she was under no obligation to improve on it by adducing more specific facts, and the claim should not have been dismissed for her failure to do so. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989) (holding that a discrimination claim should not have been dismissed for failure to produce sufficient evidence of discrimination, since defendant moved for summary judgment only on the ground that the claim was time-barred.)

■ As an alternative ground for dismissal, defendants contend that Hartman's § 1985(3) claim fails as a result of this court's decision in *Travis v. Gary Comm'y Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991), which held, reaffirming *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir.1972), that "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' [under § 1985] when acts within the scope of their employment are said to be discriminatory or retaliatory."[4] Hartman contends, however, that the *Travis* rule, known as the intracorporate conspiracy doctrine, does not apply here because Glover and Brady acted with "personal racial animus" when they instructed Hartman to keep the Caravan program out of Latino neighborhoods.

*American Motors Corp.*, 728 F.2d 334, 339 (6th Cir.1984); *Richmond v. Board of Regents of the Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir.1992). *But see: Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1259 (3d Cir.), *vacated on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Stathos v. Bowden*, 728 F.2d 15, 20 (1st Cir.1984).

Other courts have concluded that collective corporate action attributable to such a motivation falls outside the reach of the intracorporate conspiracy doctrine, and can therefore give rise to a § 1985(3) conspiracy claim. *See Garza v. City of Omaha,* 814 F.2d 553, 557 (8th Cir.1987); *Buschi,* 775 F.2d at 1252–53; *Walker v. Woodward Governor Co.,* 631 F.Supp. 91, 94–95 (N.D.Ill.1986). Similarly, in the antitrust context, where the doctrine originated, corporate agents acting within the scope of their employment are held capable of conspiring when they act "on their own behalf" or with an "independent personal stake" in the corporate action. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769–70 n. 15, 104 S.Ct. 2731, 2740–41 n. 15, 81 L.Ed.2d 628 (1984); *Greenville Publishing Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 399–400 (4th Cir.1974). *See also* 10 Fletcher Cyclopedia of the Law of Private Corporations § 4884 at 369 (1993).

This exception is problematic in the context of § 1985(3), however, because every claim under that statute depends on a showing that the conspirators shared an "inviduously discriminatory motivation," a term that would seem to be synonymous with "personal racial animus" (and not much different from "independent personal stake"). *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798. Thus, by proving a prima facie case under § 1985(3), the plaintiff would necessarily bring his or her claim within the exception that Hartman proposes, rendering the intracorporate conspiracy doctrine meaningless. Because the proposed exception would therefore contradict *Travis,* we conclude that the rule of that case is not avoided simply by showing that corporate employees were motivated in part by personal bias.

Having said that, we should point out that *Travis* probably would not apply where corporate employees are shown to have been motivated solely by personal bias. In that case, the interests of the corporation would have played no part in the employees' collective action, so the action could not have been taken within the scope of employment. 10 Fletcher § 4877 at 339; Restatement (2d) of Agency § 228 (1958). In the instant case, however, Hartman has not attempted to show that the interests of City Colleges played no part in defendants' restriction of the Caravan program, and certainly their control of the program was related to City Colleges business. Thus, we cannot conclude that Glover and Brady acted outside the scope of their employment.

Note, though, that not all discriminatory action taken within the scope of employment, and thus attributable to the corporation, is exempt from the operation of § 1985(3). As stated in *Dombrowski:*

> We do not suggest that an agent's action within the scope of his authority will always avoid a conspiracy finding. Agents of the Klan certainly could not carry out acts of violence with impunity simply because they were acting under orders from the Grand Dragon. But if the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by this statute.

459 F.2d at 196. Similarly, in *Volk v. Coler,* 845 F.2d 1422, 1435 (7th Cir.1988), the intracorporate conspiracy doctrine was held not to apply where the plaintiff alleged "numerous acts undertaken by several" corporate agents. Although *Travis* subsequently rejected the idea that the doctrine is avoided merely because the alleged conspiracy involves more than one discriminatory act, it too acknowledged that the nature of the discriminatory activity may require that the doctrine be disregarded:

> Members of the Ku Klux Klan could not avoid liability by incorporating, for they would still be trying to organize (through persuasion or terror) multiple centers of social or economic influence ... The Klan meddled in the business of others; that is what made it dangerous.

921 F.2d at 110.

In the instant case, the alleged conspiracy was rather limited both in its immediate object—restricting the scope of the Caravan program—and in its membership—Glover and Brady. Hartman does not claim that the conspiracy was part of some broader discrim-

inatory pattern at City Colleges, or that it in any way permeated the ranks of the organization's employees. Thus, this case does not involve the kind of extensive discriminatory conspiracy that *Dombrowski, Volk,* and *Travis* contemplated as falling outside the protection of the intracorporate conspiracy doctrine.

For these reasons, we conclude that the agreement between Glover and Brady to restrict the scope of the Caravan program did not constitute a conspiracy within the meaning of § 1985(3).

## B. The § 1983 Retaliation Claim

■ As the district court noted, public employees are protected from adverse employment action on the basis of their speech only if they speak "upon matters of public concern" as opposed to matters "of personal interest." *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. A showing of public concern turns not on the general subject matter of the employee's speech, but on "the content, form, and context of a given statement." *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. It is critical, therefore, that the employee claiming retaliation be able to recount these elements of his or her speech with some degree of specificity. Certainly Hartman was required to do so in response to defendants' summary judgment motion, which plainly raised the issue. (Rec. 76 at 10–13.)

With one exception, however, Hartman did not describe her statements in any detail. Rather, she simply claimed to have "refused" to do a variety of things that Brady and Glover instructed her to do. The verbal content, the form, and the broader context of her refusals remain a mystery, making it impossible to address the legal question of whether the refusals actually raised a matter of public concern. It is not enough that the things she refused to do or say were them-

selves of public concern, for it is the nature of *her* expression, not the actions of her supervisors, that we must gauge. Further, the court is not required to assume that because an employer's action *could* be objected to as an issue of public concern, the employee must have objected to it on that basis.

Hartman failed to elaborate on her allegations concerning her objections to the scope of the Caravan program, to Brady's and Glover's use of a racial slur, and to all but one of the detestable tasks that they assigned her. Thus, none of these objections supports a First Amendment claim for retaliation.

■ Hartman did adequately elaborate, however, on her claim concerning Glover's alleged requests for assistance in soliciting sexual favors from other City Colleges employees. Hartman says she objected to such requests in separate, private conversations with Glover and Brady, telling Glover that the requests were an "abuse of power," that they would get him "in a lot of trouble," and that he was "not acting as a chairman of the board," and telling Brady that she, Hartman, was "sick of being pressured by" the requests, that they were "very improper," and that, as a result of them, Glover "was going to get himself in an awful lot of trouble."

■ Whether these statements are directed toward a matter of public concern depends in part on the motivation behind them. *Colburn v. Trustees of Indiana Univ.,* 973 F.2d 581, 586 (7th Cir.1992). Thus, even if an issue is one of public concern in a general sense, as sexual harassment surely is, still we must ask whether the speaker raised the issue *because* it is matter of public concern or whether, instead, the issue was raised to "further some purely private interest." *Callaway v. Hafeman,* 832 F.2d 414, 417 (7th Cir.1987).[5] When the speaker's motives are mixed, as often they are, the speech will not be found to raise a matter of public

---

5. In *Connick,* the Supreme Court noted that racial discrimination is "a matter inherently of public concern." *Connick,* 461 U.S. at 148 n. 8, 103 S.Ct. at 1690 n. 8. The court was referring, however, to the facts of *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 413, 99 S.Ct. 693, 695, 58 L.Ed.2d 619 (1979), in which the plaintiff claimed she was retaliated against for

protesting the discriminatory "policies and practices of the school district, especially the school to which she was assigned to teach." When similarly broad-based protests against policies of sex discrimination are involved, we have readily found that the protests raise matters of public concern. *See Marshall v. Allen,* 984 F.2d 787, 795 (7th Cir.1993).

concern if "the overriding reason for the speech," as determined by its content, form, and context, appears to have been related to the speaker's personal interests as an employee. *Colburn,* 973 F.2d at 587.

We conclude that Hartman's speech related predominantly to her personal interest in resolving the friction between herself and Glover, not to her concern as a citizen over the sexist behavior of a City Colleges official. This conclusion is based on the interplay of a few factors, none of which is determinative. First, the content of Hartman's speech addressed primarily, though not exclusively, the individual interests of herself and of Glover: she was sick of the pressure; he might get into trouble. Second, Hartman chose to speak in an informal, private setting. *See Callaway,* 832 F.2d at 417. She made no public or lasting record of her concerns, and she did not try to disclose them beyond the small circle of people who might have been able to help improve her own situation. Third, Hartman's statements were made in the context of a personal conflict between Hartman and Glover, not as part of some broader effort to protest sexual harassment. *Id.*

We reiterate that none of these factors alone decides the case. Matters of public concern may be raised in the midst of a personal dispute. *Colburn,* 973 F.2d at 587. And they may be expressed in a private setting. *Givhan,* 439 U.S. at 414, 99 S.Ct. at 696. In this case, however, in view of the particular combination of content, form, and context that describes Hartman's statements, we are convinced that the statements did not address a matter of public concern. Thus, the retaliation claim was properly dismissed.

### III.

For the foregoing reasons, the district court's grant of summary judgment in favor of defendants is

AFFIRMED.