**Hope BRIGGS, Plaintiff,**

**v.**

**NORTH SHORE SANITARY DISTRICT; Karen Farrell, individually and as an agent of North Shore Sanitary District; Tony Favero, individually and as an agent of North Shore Sanitary District; John Tegen, individually and as an agent of North Shore Sanitary District; Gina Piotrowski, individually and as an agent of North Shore Sanitary District; and Mark Hawn, individually and as an agent of North Shore Sanitary District, Defendants.**

No. 95 C 4609.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 9, 1996.

cago, IL, for North Shore Sanitary District, Karen Farrell, Toni Favero, John Tegen.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

Plaintiff Hope Briggs brings this six-count Second Amended Complaint against the North Shore Sanitary District ("NSSD"), four of its employees, and a member of its Board of Trustees.[1] Presently before this court is the defendants' motion to dismiss, and for the reasons set forth below, the motion is granted in part and denied in part.

### I. Background

Briggs, an African–American woman, applied for a position as an analytical chemist at NSSD in September 1993. Despite allegedly being told that she would not enjoy working at the facility because of the smell of waste water, Briggs persisted and was hired by NSSD on October 6, 1993. However, she claims that from the time she started working at NSSD her employer refused to train her properly, thereby ensuring her failure. Briggs claims that a co-worker named John Tegen was assigned to train her, but that he worked with her for a shorter period of time than was necessary and omitted essential information from her training. Second Compl. ¶¶ 16–18. Briggs informed her immediate supervisor, Toni Favero, about this inadequacy in her training, as well as about racial slurs that Tegen allegedly directed at her,[2] but Favero shrugged off her complaints. Id. ¶¶ 19–24. Favero's only action, Briggs contends, was to assign Gina Piotrowski to observe Briggs for one week in April 1994. On June 11, 1994, Favero placed Briggs on probation for four weeks. Id. ¶ 34. This probationary period was subsequently extended to September 26, 1994, ostensibly because Briggs had used expired water samples in some of her tests, although Briggs contends that Favero gave her the samples. Id. ¶¶ 36–37.

Claudia Oney, Patricia Kiper Rummer, Claudia Oney, P.C., Chicago, IL, for Hope Briggs.

James O. Nolan, Diane M. Baron, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chi-

---

1. The Second Amended Complaint ("Second Compl."), filed on November 28, 1995, includes an allegation that Briggs exhausted her administrative remedies under the Americans with Disabilities Act and Title VII. Consequently, the defendants have withdrawn their argument that Counts II, III, and V have not been exhausted.

2. Tegen is alleged to have said "blacks keep chickens in their refrigerators," and "blacks practice voodoo." Second Compl. ¶¶ 20–21.

In addition to disciplinary action, Briggs contends that she was treated with disdain and hostility by her white co-workers and supervisors. In particular, she accuses Favero of refusing to sit with her in the lunchroom on one occasion, and another time of failing to invite her out to lunch with all her co-workers. *Id.* ¶¶ 30–31. In November 1993, Piotrowski allegedly hung a black "pickaninny" doll, suspended by a string tied around its neck, to a bulletin board in the lab area shared with Briggs. The plaintiff complained about the doll, but claims that no one at NSSD took any action to remove it. *Id.* ¶¶ 32–33. Finally, Briggs claims that on the morning of July 6, 1994, she observed Favero and Piotrowski standing near the switch for the exhaust fan, and after her eight hour shift she discovered that the exhaust fan had been turned off, thereby exposing her to toxic mercury fumes for eight hours. She claims that she suffered headaches and chemical burns to her nose and lungs, requiring her to stay home for the following two days. *Id.* ¶¶ 42–43.

The plaintiff also alleges that because she was required to perform repetitive tasks such as "pipetting," she developed a repetitive stress injury to her wrist, which was aggravated by being required to lift fifty pound drums of water. She claims that she asked Favero to assign her to a position that did not involve "pipetting," but that Favero said no such position existed. Briggs alleges that her wrist deteriorated, and that she eventually filed for worker's compensation benefits. The plaintiff contends that Favero said she was "stupid to complain about a strained wrist," and that the other defendants mocked and disparaged her because of her injury. Second Compl. Count V ¶¶ 61, 66.

Briggs claims that she contacted the Urban League of Waukegan in July 1994 to complain about the racial hostility at NSSD, and the organization scheduled a meeting with NSSD for August 1994. Prior to the meeting Briggs was asked to meet with Karen Farrell, the Director of Laboratory Services at NSSD, who told Briggs that she knew Briggs had spoken to the Urban League "because you're the only black here, and the doll was in your lab." Second Compl. ¶ 41. Farrell and Mark Hawn, a member of the Board of Trustees of NSSD,[3] met with Urban League representatives on August 31, 1994, during which time they admitted the existence of the pickaninny doll in the laboratory. However, during the meeting they also characterized Briggs as a troublesome employee who had filed a Title VII lawsuit against her previous employer, and disparaged her for taking time off from work because of her alleged wrist injury. Second Compl. ¶ 47, Count V ¶ 62.

On September 19, 1994, NSSD terminated Briggs for "writing over" numbers in test result forms after turning off the testing instruments. Briggs claims that no one at NSSD had informed her that "writing over" numbers was improper, and that Tegen and Favero had even approved this practice. *Id.* ¶¶ 48–50. She claims that although she performed her duties as well as Tegen, she was terminated while he was not. Finally, Briggs contends that although NSSD employs approximately 120 people, she was one of only two blacks, who were hired only because of pressure placed upon NSSD by the Urban League. *Id.* ¶¶ 52–55.

Briggs filed charges of race and disability discrimination with the EEOC on January 13, 1995 and January 30, 1995. She received right to sue letters on August 2, 1995, and filed the instant action within 90 days. Briggs brings suit against the defendants in their individual and official capacities, claiming that they violated her rights under the Equal Protection Clause of the Fourteenth Amendment, as enforced through 42 U.S.C. §§ 1983, 1985(3) (Counts I and IV), her rights to equal employment and freedom from retaliation under Title VII (Counts II and III), her rights under the Americans with Disabilities Act ("ADA") (Count V), and her state law right to be free from the intentional infliction of emotional distress (Count

---

3. The defendants argue that because Hawn has not yet been served, we should not consider any allegations in the complaint against him. However, because Hawn has not moved to dismiss the complaint for lack of service, we will consider the allegations against him in evaluating the legal sufficiency of the complaint.

VI). The defendants move to dismiss all the counts against them.

## II. Motion to Dismiss Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claims which would entitle [her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Chaney v. Suburban Bus Div. of the Regional Transp. Auth.*, 52 F.3d 623, 627 (7th Cir. 1995). At this stage in the litigation we take as true all factual allegations contained in the complaint, and construe all reasonable inferences therefrom in the plaintiff's favor. *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir.1995).

## III. Discussion

### A. Municipal Liability

■ Defendant NSSD moves to dismiss Count I, arguing that the Second Amended Complaint only refers to discrete acts of discrimination by some of the individual defendants, and does not allege that Briggs was denied her constitutional rights because of an official policy, practice, or custom of NSSD. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). It is well settled that a municipality cannot be liable for the acts of its agents under a theory of *respondeat superior*. *Id.* at 691, 98 S.Ct. at 2036. Instead, a plaintiff may establish municipal liability by proving one of the following three conditions: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with 'final policymaking authority.'" *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir.1994) (citations and quotation omitted). Although claims of municipal liability need not be pled with a great factual specificity, *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,

507 U.S. 163, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993)), the Federal Rules nonetheless require a plaintiff to allege sufficient facts to support the existence of a municipal policy, *Baxter by Baxter*, 26 F.3d at 736.

■ Briggs does not contend that an explicit written policy of racial discrimination existed at NSSD. Rather, she claims that discrimination was so pervasive that it constituted a practice or custom condoned by NSSD, and that the allegedly unconstitutional acts were committed by final policymakers. With regard to her first argument, we doubt that Briggs will be able to prove the sort of widespread discriminatory conduct that must be shown to support an inference that the policymakers at NSSD condoned the termination of employees because of their race. For example, in *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511–12 (7th Cir. 1993), the evidence showed that at least forty-seven white employees complained to the CTA's Board about their terminations, that more than seventy percent of the attorneys hired by the CTA were black, that white employees were assigned no new cases, and that final employment decisions were made by the Board itself. The Seventh Circuit affirmed a jury verdict against the CTA on a claim of reverse discrimination, although it conceded that the evidence in the case was "very close." *Id.; see also Allen v. City of Chicago*, 828 F.Supp. 543, 562 (N.D.Ill.1993) (allegations that sixty-two individuals from different city departments suffered adverse employment decisions because of race, and that various department heads acted discriminatorily over an extended period of time, were sufficient to state claim under § 1981). By contrast, Briggs alleges that for a period of less than one year she suffered discriminatory treatment at the hands of her co-workers, was placed on probation and later terminated by her supervisor Favero, and was branded a troublemaker by Farrell and Hawn. In addition, she claims that out of 120 positions at NSSD, only two were filled with black employees. Although we are not confident of the plaintiff's ability to prove that such conditions were long-standing and widespread enough to infer that policymakers at NSSD condoned unconstitutional dis-

crimination, given the liberal pleading standards of Rule 8 we cannot dismiss Briggs's claim at this point. *See Leatherman,* 507 U.S. at ——, 113 S.Ct. at 1163.

■ However, we do not believe that Briggs can prevail against NSSD by baldly alleging that Hawn and Farrell had final policymaking authority at the NSSD.[4] To be sure, the identification of policymaking officials is a question of state law which normally requires us to review "the relevant legal materials, including state and local positive law, as well as ' "custom or usage" having force of law.' " *Jett v. Dallas Indep. School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989) (quoting *St. Louis v. Praprotnik,* 485 U.S. 112, 124 n. 1, 108 S.Ct. 915, 924 n. 1, 99 L.Ed.2d 107 (1988)). However, even if Hawn, as a member of the Board of Trustees, could exercise sufficient policymaking authority to implicate the NSSD, there is no allegation by Briggs that Hawn took any unconstitutional action against her. At best, Briggs asks us to infer from Hawn's statements to Urban League representatives that he was responsible for the conditions of her employment and her eventual termination. However, without an actual allegation by Briggs that Hawn was somehow involved in her adverse employment conditions, we cannot see how Briggs can proceed against the NSSD by pointing to Hawn's policymaking authority. Similarly, Briggs has failed to allege any basis for concluding that Farrell was a policymaker at the NSSD. "It is true that a single act or decision of a final policymaker can establish municipal policy. A necessary corollary of this point, however, is that it must first be alleged adequately that a defendant is a final policymaker." *Baxter by Baxter,* 26 F.3d at 735 (citation omitted). Nowhere in the complaint does Briggs allege that Farrell had such authority, and we decline to accept her suggestion that we infer such authority on her part. Accordingly, while we decline to dismiss Count I against NSSD, we conclude

that Briggs may only proceed against the NSSD by proving that the alleged acts of discrimination she suffered were part of a long-established and widespread practice that must have been known by the policymakers at the NSSD.

### B. Qualified Immunity for the Individual Defendants

■ The individual defendants next argue that they are entitled to qualified immunity on Count I. However, governmental officials may claim qualified immunity only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Assuming the veracity of the complaint—as we must at this stage—the individual defendants are alleged to have demeaned the plaintiff, hung a likeness of a black child by a noose in the office for months, failed to train the plaintiff, and caused her to be terminated, all because of her race. The defendants make no argument as to how such conduct would be protected by qualified immunity, and we can imagine none. Accordingly, we decline to dismiss Count I against the individual defendants.

### C. Individual Liability Under Title VII and ADA

■ The individual defendants next seek dismissal of Counts II, III and V, arguing that individuals who do not otherwise meet the definition of an "employer" cannot be held liable under Title VII or the ADA. *Williams v. Banning,* 72 F.3d 552, 553–555 (7th Cir.1995) (interpreting Title VII as not permitting suits against individual supervisors); *EEOC v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1279–82 (7th Cir.1995) (same interpretation of ADA). Perhaps realizing the futility of her claims, Briggs does not even respond to the argument. We agree with the individual defendants that

---

**4.** Briggs also asks us to infer that Favero had been delegated final decision making authority over hiring and firing. Pl.Resp. to Motion to Dismiss, at 6. However, Briggs gives us no reason to make this inference, and we think it highly implausible that a supervisor in Favero's

position constituted a "policymaker" as contemplated by § 1983. *See Auriemma v. Rice,* 957 F.2d 397, 400–01 (7th Cir.1992) (holding Superintendent of Police not to be policymaker of City of Chicago for purposes of hiring and firing of officers).

they cannot be held liable under Title VII or the ADA, and accordingly grant their motion to dismiss them from Counts II, III, and V.

### D. Conspiracy to Violate Civil Rights

The defendants next challenge the legal sufficiency of Count IV, in which the plaintiff alleges that they engaged in a conspiracy to deprive her of her constitutional right to equal protection, in violation of 42 U.S.C. § 1985(3). "To prevail under § 1985(3), a plaintiff must prove, first, that the defendants conspired; second, that they did so for the purpose of depriving any person or class of persons the equal protection of the laws; and third, that the plaintiff was injured by an act done in furtherance of the conspiracy." *Hartman v. Board of Trustees of Community College Dist. No. 508*, 4 F.3d 465, 469 (7th Cir.1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971)). However, the intra-corporate conspiracy doctrine precludes the imposition of liability under § 1985(3) against "managers of a corporation jointly pursuing its lawful business ... when acts within the scope of their employment are said to be discriminatory or retaliatory." *Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108, 110 (7th Cir.1990), *cert. denied*, 502 U.S. 812, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991); *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir.1972) (Stevens, J.).[5] Although the doctrine was initially applied to private parties, it has since been extended to individual members of a single governmental entity as well. *Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir.1994); *Hartman*, 4 F.3d at 470–71. Thus, where a governmental entity is characterized as a "single 'center[ ] of social or economic influence,' " its members fall under the intra-corporate conspiracy doctrine. *Wright*, 40 F.3d at 1508 (quoting *Travis*, 921 F.2d at 110, and *Dombrowski*, 459 F.2d at 196); *see Allen*, 828 F.Supp. at 564.

In this case, the defendants are alleged to have agreed to deprive Briggs of her rights under the Equal Protection Clause, and to have carried out this plan by failing to train her properly, giving her outdated test samples, and directing her to follow improper procedures that led to her termination. Second Compl. Count IV ¶¶ 56–58. All the defendants are employees or supervisors at NSSD, and thus Briggs cannot claim that they "conspired" with themselves to violate her constitutional rights. *See Allen*, 828 F.Supp. at 564 (holding that mayor, commissioner, and aldermen are all members of the City of Chicago municipal corporation, and thus not "people" capable of conspiring with each other for purposes of § 1985(3)).[6] Accordingly, Count IV is dismissed.

### E. Intentional Infliction of Emotional Distress

Finally, the defendants seek dismissal of Count VI, alleging a state law claim of intentional infliction of emotional distress. Under Illinois law—which the parties agree controls this portion of their dispute—there are three elements to a claim of intentional infliction of emotional distress:

First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that this conduct will cause severe emo-

---

**5.** The plaintiff cites *Volk v. Coler*, 845 F.2d 1422, 1434 (7th Cir.1988) for the proposition that the intra-corporate conspiracy doctrine does not apply where the defendants are alleged to have committed multiple acts of discrimination. However, any language to this effect in *Volk* was dicta, 845 F.2d at 1439 (Manion, J., concurring), and was expressly disavowed in *Travis*, 921 F.2d at 111.

**6.** This case does not fall into the narrow exception identified in *Hartman* for when a plaintiff claims "that the conspiracy was part of some broader discriminatory pattern ... or that it in any way permeated the ranks of the organization's employees." 4 F.3d at 470–71. Although there are five individuals who are alleged to have participated in the conspiracy, their alleged purpose was rather limited—keeping Briggs from succeeding at her position. *See Wright*, 40 F.3d at 1508 (concluding that alleged conspiracy of thirteen officials to stifle plaintiff's personal and professional grievances did not constitute "egregious circumstances" justifying relaxation of doctrine). Moreover, Briggs does not allege that the defendants acted totally outside the scope of their agency relationship with NSSD. 4 F.3d at 470.

tional distress. Third, the conduct must in fact cause *severe* emotional distress. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 702 (7th Cir.1993) (quoting *McGrath v. Fahey*, 126 Ill.2d 78, 127 Ill.Dec. 724, 727, 533 N.E.2d 806, 809 (Ill.1988)) (emphasis in original). Defendants first argue that the complaint does not meet the "high standard for extreme and outrageous conduct" required in Illinois, *Jaskowski v. Rodman & Renshaw, Inc.*, 813 F.Supp. 1359, 1363 (N.D.Ill.1993). We agree in part. For example, Briggs claims that she suffered extreme emotional distress and anguish because of the hanging pickaninny doll in her office, her subjection to racial slurs, her exclusion from office social activities, her placement on probation, and the refusal by the defendants to train her properly. Second Compl. Count VI ¶¶ 56–61. While such conduct is deplorable, under Illinois law it cannot provide the basis for a claim of intentional infliction of emotional distress. *See Harriston*, 992 F.2d at 703 (affirming dismissal of claim by plaintiff that she was, among other things, reprimanded for no reason, forced out of a management position, excluded from office activities, not advised of changes in office policies, and falsely accused of poor sales); *Piech v. Arthur Andersen & Co. S.C.*, 841 F.Supp. 825, 831–32 (N.D.Ill.1994) (holding sexual harassment claim insufficient under Illinois law, and collecting cases of sufficiently extreme behavior); *Jaskowski*, 813 F.Supp. at 1363 (holding that sexual discrimination and sexual harassment claims did not state claim under Illinois law).

■ However, the plaintiff also alleges that she was exposed to toxic mercury fumes for more than eight hours because Favero and Piotrowski turned off the exhaust fan in her lab area. Second Compl. Count VI ¶ 62. She claims that she suffered headaches and lung damage because of the incident, as well as severe emotional distress. *Id.* ¶ 43, Count

VI ¶¶ 56, 63. We cannot conclude as a matter of law that such conduct was not extreme and outrageous enough under Illinois law.

 Accordingly, we grant the motion to dismiss Count VI, except with regard to the allegation that defendants Favero and Piotrowski intentionally exposed Briggs to harmful mercury fumes.[7]

### IV. Conclusion

For the reasons set forth above, the defendants' motion to dismiss the Second Amended Complaint is granted in part and denied in part. It is so ordered.

---

7. This claim is not precluded by the Illinois Local Government & Governmental Employees Tort Immunity Act, 745 ILCS 10/2–201, since the Act does not protect employees from willful and wanton misconduct, *Youker v. Schoenenberger*, 22 F.3d 163, 168 (7th Cir.1994). Here, Briggs's allegations of racial epithets and racial animus are sufficient to support her claim of willful and wanton misconduct.

Nor does the Illinois Worker's Compensation Act, 820 ILCS 305/1 *et seq.*, preclude Briggs's claim, as she is claiming that she was injured because of the defendants' intentional acts rather than an accident in the workplace. *See Johnson v. Federal Reserve Bank of Chicago*, 199 Ill. App.3d 427, 145 Ill.Dec. 558, 562, 557 N.E.2d 328, 332 (Ill.App.Ct.), *appeal denied*, 133 Ill.2d 558, 149 Ill.Dec. 323, 561 N.E.2d 693 (Ill.1990).