Eugene **EGGLESTON**, Plaintiff,

v.

**SOUTH BEND COMMUNITY SCHOOL CORPORATION**, William Farrell, Clarke Dippell, and Christopher Clarke Defendants.

No. 3:92cv00672 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

April 22, 1994.

John C. Hamilton, Doran Blackmond Ready Hamilton and Williams, South Bend, IN, for Eugene Eggleston.

Donald L. Dawson, Thomas E. Wheeler, II, Kightlinger and Gray, Indianapolis, IN, Marva J. Leonard–Dent, South Bend Community School Corp., South Bend, IN, for South Bend Community School Corp.

Thomas E. Wheeler, II, Kightlinger and Gray, Indianapolis, IN, Thomas J. Brunner, Jr., Paul J. Peralta, Kevin D. O'Rear, Baker and Daniels, Robert J. Konopa, Konopa and Murphy PC, South Bend, IN, for William Hugh Farrell, Clarke E. Dippell and Christopher Clarke.

Gail S. Coleman, E.E.O.C., Washington, DC, for E.E.O.C., amicus curiae.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

The plaintiff, Eugene Eggleston, filed his original Complaint on October 6, 1992. The Third Amended Complaint, filed on August 2, 1993, contains several claims against the above-captioned defendants. First, the plaintiff asserts illegal retaliation under the Age Discrimination in Employment Act ("ADEA"). Next, the plaintiff alleges viola-

tions of the ADEA, the First Amendment, and the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.[1] In addition, the plaintiff alleges a state claim based on the intentional infliction of emotional distress. Finally, the plaintiff also seeks compensatory and punitive damages in connection with the ADEA claim.

The plaintiff is a high school teacher and football coach and is employed by the South Bend School Corporation ("School Corporation"). In February 1988, the plaintiff filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). In pursuing this charge, the plaintiff alleged that the School Corporation had denied him a teaching position because of his age in violation of the ADEA. On December 28, 1989, the EEOC found the plaintiff's charge of age discrimination was supported by probable cause. In March 1990, the plaintiff, the School Corporation, and the EEOC entered into a conciliation agreement. The School Corporation agreed that all employment practices were to be conducted in a non-discriminatory manner. In addition, the School Corporation agreed that the plaintiff would be paid back wages and that it would rehire the plaintiff for the balance of the 1989–90 school year as a substitute teacher and as a permanent teacher for the 1990–91 school year forward. Finally, and most importantly, to this matter, the conciliation agreement contained the following provision:

> The parties agree that there shall be no discrimination or retaliation of any kind against the Charging Party, including, but not limited to, *consideration for coaching positions,* because of opposition to any practice declared unlawful under any statute administered by the EEOC or because of the filing of a charge; .... The parties to this conciliation agreement agree that if the Charging Party wishes to apply for a coaching position, he will be considered for the position on the same basis as any other candidate who may apply for the position.

*See Conciliation Agreement* (emphasis added).

After the conciliation agreement went into effect, the plaintiff was the head freshman coach at Adams High School and head 8th grade coach at a Edison Middle School. During the pendency of his coaching, the plaintiff indicated that he had to file three grievances against the School Corporation for certain violations of his contractual rights secured under a labor agreement, and that all of those grievances had been settled in his favor.

Additionally, in May 1992, the plaintiff filed a charge of retaliation based upon the School Corporation's violation of the conciliation agreement. This second charge alleged that the School Corporation was retaliating against him for having filed the first ADEA charge. In pursuing this action, the plaintiff maintained that the School Corporation subjected him to a continuing pattern of harassment and intimidation, and removed him from his duties as Edison Middle School head football coach. Furthermore, in this action, the plaintiff explained that the head coach failed to provide him with the requisite assistance and cooperation in the performance necessary for proper coaching. On September 28, 1992, the Commission found cause to believe that the School Corporation had violated the retaliation provisions of the ADEA.

The plaintiff filed his original Complaint on October 6, 1992, with this court based on the EEOC's finding of cause. Thereafter, on December 21, 1992, the plaintiff filed a second charge of retaliation with the EEOC. This represents the plaintiff's third proceeding with the EEOC (age discrimination, retaliation, and retaliation). The plaintiff also indicates that he amended his Complaint to assert personal injury claims against several individual employees of the School Corporation.

On November 1, 1993, the School Corporation moved for summary judgment on all claims. The abovementioned individual defendants ("Farrell, Dippell, and Clarke")

---

1. At the last hearing on this matter on March 25, 1994, the plaintiff indicated that he is no longer pursuing his § 1983 claim.

moved for summary judgment on November 15, 1993. On December 14, 1993, the Equal Employment Opportunity Commission filed an *amicus curiae* brief in opposition to defendants' motions for summary judgment. On January 12, 1994, and February 18, 1994, the plaintiff filed responses to the defendants' motions. The School Corporation and the individual defendants both filed a reply brief on February 22, 1994. In addition, the individual defendants filed a response to the EEOC's *amicus curiae* brief on February 22, 1994. On March 7, 1994, the plaintiff filed a surreply to the individual defendants' reply. Finally, on March 11, 1994, the individual defendants filed a response to the plaintiff's surreply. This court has held several hearings—the most recent hearing was held on March 25, 1994.

## II.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762 (7th Cir.1993).

A thorough discussion of Rule 56 by the Supreme Court of the United States can be found in a trilogy of cases decided in 1986. *See, Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) [2]; and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex,* 477 U.S. at 324, 106 S.Ct.

at 2553 (quoting Fed.R.Civ.P. 56). A material question of fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Hughes v. Joliet Correctional Center,* 931 F.2d 425, 428 (7th Cir.1991), or upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990).

During its analysis, this court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Brennan v. Daley,* 929 F.2d 346, 348 (7th Cir.1991). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–255, 106 S.Ct. at 2512–14.

The 1986 Supreme Court trilogy was recently re-examined in *Eastman Kodak v. Image Technical Services,* —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), a case born in the context of antitrust law. The most that can be said for *Kodak* is that it did not tinker with *Celotex* and *Anderson,* and possibly involves an attempt to clarify *Matsushita.* This view is well supported by an in-depth academic analysis in Schwarzer, Hirsch, and Barrans, *The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441 (1991).

## III.

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36

---

**2.** For the judicial epilogue of *Celotex,* see *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33

(D.C.Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court established the framework for the evaluation of employment discrimination claims. "The burden of proof formula set forth in [*McDonnell Douglas*] appl[y to] cases under the ADEA." *Bates v. Carborundum Co.,* 623 F.Supp. 613, 617 (N.D.Ind. 1985). First, the employee must establish a prima facie case of discrimination. Next, the employer has the burden of producing a legitimate nondiscriminatory reason for the challenged action. Finally, the burden shifts back to the employee to show that the proffered reasons are pretextual. *Id.*

■ The plaintiff's prima facie case is based on the following provision of the ADEA entitled *Opposition to unlawful practices; participation in investigations, proceedings, or litigation:*

It shall be unlawful for an employer to discriminate against any of his employees … because [the employee] has opposed any practice made unlawful by this section, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

*See* 29 U.S.C. § 623(d) *See also* 42 U.S.C. § 2000e–3(a). The prima facie case required under the first step requires: (i) a showing that the employee engaged in statutorily protected expression; (ii) an adverse action by the employer; and (iii) a causal link between the protected expression and the adverse action. *See Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1313 (7th Cir.1989); *Collins v. Illinois,* 830 F.2d 692, 702 (7th Cir.1987); *Archuleta v. Colorado Dep't of Institutions,* 936 F.2d 483 (10th Cir.1991); *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1423 (D.C.Cir.) (per curiam), *supplemented on other grounds on reh'g,* 852 F.2d 619 (D.C.Cir.1988) (per curiam), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989).

■ The defendants argue that the plaintiff's prima facie case fails insofar as there was no adverse action and no causal connection. On the issue of adverse action, the defendants argue that the plaintiff did not endure any change in his job status or economic loss; and therefore, the plaintiff cannot make out a prima facie case of retaliation under the ADEA. The defendants assert that in *Crady v. Liberty National Bank & Trust Co. of Indiana,* 993 F.2d 132, 135 (7th Cir.1993), the Seventh Circuit indicated that adverse action for purposes of the ADEA included "a materially adverse change in the terms and conditions of employment [which] must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* The *Crady* court also indicated that "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* The defendants argue that "[a]t best the allegations of harassment in [the deposition of the plaintiff] collectively amount to nothing more than a personality dispute and a 'mere inconvenience or an alteration of job responsibilities' under *Crady* and thus fail to achieve the level of an adverse action by the employer necessary to make out a prima facie case." *See Defendants' Brief in Support of Motion for Summary Judgment* at 8.

This court notes that the Equal Employment Opportunity Commission appears as *amicus curiae* in opposition to the defendants' abovementioned motions for summary judgment. The EEOC argues that the "hostile environment" theory under the ADEA is viable. Specifically, the EEOC maintains that the ADEA "provide[s] a statutory basis for a claim of hostile environment discrimination regardless of whether a plaintiff has suffered a change in his job status…." *See Brief of the Equal Employment Opportunity Commission as Amicus Curiae in Opposition to Defendants Motions for Summary Judgment* at 5. The EEOC argues that this theory is viable in light of the Supreme Court decision in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In addition, in support of the ADEA hostile environment claim, the EEOC also explains that proposed regulations covering harassment were issued on October 1, 1993.

See 58 *Fed.Reg.* 51,266 (1993) (proposed 29 *C.F.R.* §§ 1609.1, 1609.2). In the proposed regulations, the EEOC "reiterate [their] position that harassment on the basis of ... age ... constitutes discrimination in the terms, conditions, and privileges of employment and, as such, violates ... the ADEA." *Id.*

In *Vinson,* the Court considered the Title VII ramifications created by "unwelcome sexual advances that create an offensive or hostile working environment." *Id.* at 64, 106 S.Ct. at 2404. On this issue, the Court indicated that "[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Id.* In *Vinson,* the petitioner maintained "that in prohibiting discrimination with respect to 'compensation, terms, conditions, or privileges' of employment, Congress was concerned with what petitioner describes as 'tangible loss' of 'an economic character,' not 'purely psychological aspects of the workplace environment.'" *Id.*

On this issue, the Court, speaking through Justice Rehnquist, explained that a Title VII claim could be based on a hostile workplace environment:

> First, the language of Title VII is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "'to strike at the entire spectrum of disparate treatment of men and women'" in employment. *Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 707, n. 13 [98 S.Ct. 1370, 1375, n. 13, 55 L.Ed.2d 657] (1978), quoting *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1198 (CA7 1971). Petitioner has pointed to nothing in the Act to suggest that Congress contemplated the limitation urged here.

> \*   \*   \*   \*   \*   \*

In concluding that so-called "hostile environment" (i.e., non quid pro quo) harassment violates Title VII, the EEOC drew upon a substantial body of judicial decisions and EEOC precedent holding that Title VII affords employees the right to work in an environment free from discrimi-natory intimidation, ridicule, and insult. *See generally* 45 *Fed.Reg.* 74676 (1980). *Rogers v. EEOC,* 454 F.2d 234 (CA5 1971), *cert. denied,* 406 U.S. 957 [92 S.Ct. 2058, 32 L.Ed.2d 343] (1972), was apparently the first case to recognize a cause of action based upon a discriminatory work environment. In *Rogers,* the Court of Appeals for the Fifth Circuit held that a Hispanic complainant could establish a Title VII violation by demonstrating that her employer created an offensive work environment for employees by giving discriminatory service to its Hispanic clientele. The court explained that an employee's protections under Title VII extend beyond the economic aspects of employment:

> "[The] phrase 'terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.... One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers...." 454 F.2d, at 238.

Courts applied this principle to harassment based on race, *e.g., Firefighters Institute for Racial Equality v. St. Louis,* 549 F.2d 506, 514–515 (CA8), *cert. denied sub nom. Banta v. United States,* 434 U.S. 819 [98 S.Ct. 60, 54 L.Ed.2d 76] (1977); *Gray v. Greyhound Lines, East,* 545 F.2d 169, 176 (1976), religion, *e.g., Compston v. Borden, Inc.,* 424 F.Supp. 157 (S.D.Ohio 1976), and national origin, *e.g., Cariddi v. Kansas City Chiefs Football Club,* 568 F.2d 87, 88 (CA8 1977). Nothing in Title VII suggests that a hostile environment based on discriminatory sexual harassment should not be likewise prohibited. The Guidelines thus appropriately drew from, and were fully consistent with, the existing case law.

*Id.* at 64–66, 106 S.Ct. at 2404–05.

In constructing this argument, the EEOC points out that the ADEA makes it unlawful for an employer to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment because of such individual's age, and this language is identical to Title VII's prohibition against discrimination on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e–2(a)(1). The EEOC argues that in *Vinson,* the Supreme Court interpreted language in Title VII that is identical to the language of the ADEA in 29 U.S.C. § 623(a)(1). Insofar as the statutory language contained in the ADEA and Title VII is identical, the EEOC asserts that the ADEA supports a claim for a hostile environment similar to the Title VII hostile environment claim outlined in *Vinson.*

This court finds that a claim based on a hostile environment is viable under the ADEA. There is no question that the words of Chief Justice Rehnquist in *Vinson* are very cogent and persuasive on this issue. This court also notes that there is virtually little or no differences between the ADEA and Title VII for purposes of liability. In fact, the Supreme Court has noted the similarities between the two statutes and indicated that "the prohibitions of the ADEA were derived *in haec verba* from Title VII." *See Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978). Therefore, this court holds that in light of *Vinson,* "[t]here is no sound reason why this court should interpret identical statutory language in the context of age discrimination any differently." *Drez v. E.R. Squibb & Sons, Inc.,* 674 F.Supp. 1432, 1436–37 (D.Kan.1987).

In *Passer v. American Chemical Soc.,* 935 F.2d 322 (D.C.Cir.1991), the court evaluated whether the cancellation of a seminar "was, as a matter of law, ... the sort of adverse employer action proscribed by the [ADEA] statute." *Id.* On this issue, the *Passer* court explained that "the District Court erred in holding that the cancellation of a major public symposium in an employee's honor cannot be an act of 'retaliation as intended by the ADEA.'" *Id.* The *Passer* court explained that "[t]he statute itself proscribes 'discrimination' against those who invoke the Act's protections; the statute does not limit its reach only to acts of retaliation that take the form of cognizable employment actions such as discharge, transfer or demotion." *Id.*

In finding the "cancellation of the seminar humiliated [the plaintiff] before the assemblage of his professional associates and peers from across the nation," the *Passer* court, speaking through Judge Edwards, explained that "a ... restrictive reading of ADEA's anti-retaliation provision [can not] be squared with other cases that have found illegal retaliation in employer conduct that could not be described strictly as an 'employment action.'" *Id.* Therefore, the *Passer* court held that "[o]n these facts, [the defendant] clearly 'engaged in conduct having an adverse impact on the plaintiff[,]' [and the] action [of] aborting a 'rare and prestigious,' and highly public, honor for an employee on the eve of its occurrence simply cannot be dismissed ... as the inconsequential withdrawal of a mere 'gratuity.'" *Id.* This court finds the analysis in *Passer* very cogent and persuasive on this issue.

This court notes the Supreme Court in *Vinson* referenced certain regulations promulgated by the EEOC on the issue of whether "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Vinson, supra.* In addition, the *Vinson* court explained that the EEOC "drew upon a substantial body of judicial decisions and EEOC precedent." *Id.* Here, the EEOC has repeated that task on the issue of a hostile environment for purposes of the ADEA. In the proposed regulations on this issue, the EEOC indicates:

The Commission has long recognized that harassment on the basis of race, color, religion, sex, or national origin violates section 703 of title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq. (title VII). The Commission has also recognized that harassment based on age is prohibited by the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. 621 et seq. (ADEA). The Commission has interpreted the Rehabilitation Act of 1973, as amended, 29 U.S.C. 701 et seq., and the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 et seq. (ADA), as prohibiting harassment based on a person's disability. Regarding the ADA, see @ 1630.12 of the Commission's regulations

on Equal Employment Opportunity for Individuals With Disabilities, 56 *CFR* 35,737 (1991) (codified at 29 *CFR* 1630.12) (1992).

For more than twenty years, the federal courts have held that harassment violates the statutory prohibition against discrimination in the terms and conditions of employment. *The Commission has held and continues to hold that an employer has a duty to maintain a working environment free of harassment based on race, color, religion, sex, national origin, age, or disability, and that the duty requires positive action where necessary to eliminate such practices or remedy their effects.* The Commission has previously issued guidelines on sex-based harassment that is sexual in nature, EEOC Guidelines on Discrimination Because of Sex, 29 *CFR* 1604.11 (1992), and guidelines on national origin harassment. EEOC Guidelines on Discrimination Because of National Origin, 29 *CFR* 1606.8 (1992).

*Id.* (emphasis provided)

■ Having found that an ADEA action based on a hostile environment is feasible, this court must ascertain whether the plaintiff's claim is viable. First, the plaintiff maintains that Mr. Chuck Lennon, a member of the South Bend School Board, indicated that "[i]t will be a cold day in hell before I would recommend [the plaintiff] to be a coach in our system." The plaintiff indicates that Mr. Lennon made this comment during a meeting of the South Bend School Board. More importantly, the plaintiff maintains that Mr. Lennon's comments occurred on or near the date that the School Corporation approved the conciliation agreement. *See*

The plaintiff also indicates that he has had a number of problems with Mr. William Farrell ("Farrell"), the head coach of Adams High School and also a defendant in this case. The plaintiff indicates that during their first meeting, Farrell explained to the plaintiff that Mr. Bill Pryzybysz, the principal at Adams High School, told Farrell that "[d]owntown Eggleston is bad news." *See Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment* at 14. During this meeting, Mr. Farrell also indicated that the plaintiff "was 'on

probation,' and that he was reluctant to hire him." *Id.* at 15. Next, after serving as head freshman coach at Adams High School, Mr. Michael DeVault, the athletic director at Adams, wrote the following in the plaintiff's evaluation:

Outstanding job of coaching. Only lost 1 kid thru the year. Excellent rapport and motivation of all team members. Discipline was excellent. Covered all phases of coaching responsibilities. Outstanding scouting report for each week. Very pleased with his work.

*Id.* at 16. "Despite DeVault's favorable comments, Farrell later called a meeting with [the plaintiff] during which he had nothing but negative comments on [the plaintiff's] performance." *Id.*

The plaintiff's negative relationship with Farrell lead to the filing of three grievances. First, one year after the abovementioned evaluation, the plaintiff again received a favorable evaluation from Mr. DeVault. "However, after [the plaintiff] signed off on the affidavit, and more that 30 days after the evaluation had been completed ..., a new evaluation was produced which reflected Farrell's comments, all of which were negative." *Id.* at 17. When the plaintiff won the grievance, DeVault gave him a revised evaluation containing the following language:

Officially, this is the original evaluation, but unofficially the other evaluation and your talks with Bill Farrell indicate that some problems exist that must be changed if you are to remain on staff.

*Id.*

Next, the day after the plaintiff filed the first grievance, "Farrell told him that there was no opening for him to coach middle school football in the forthcoming spring of 1992." *Id.* "Once again [the plaintiff] was required to file a grievance and, consistent with the earlier one, [and] in short order he won that grievance as well." *Id.* In response to the grievance procedure, a memorandum containing the following language was issued:

Based on a grievance decision, please add [the plaintiff] to the position of head coach at Edison Middle School for the 1992 mid-

dle school football season. It will be Bill Farrell's decision as to which one of the original four names submitted ... should be removed.

*Id.* at 18. This announcement caused hostility among the other coaches.

A few days after this memorandum was issued, Farrell decided upon a "coaching system for the middle school which reduced [the plaintiff's] responsibility to handling a portion of the defense of the 8th grade team." *Id.* This action prompted the plaintiff to file the first charge of retaliation with the EEOC. In finding that the plaintiff's charge of retaliation was supported by good cause, the EEOC indicated that:

Subsequent to the Charging Party signing his evaluation acknowledging the appraisal [which appraised [the plaintiff to be "effective" on every factor], the evaluation was changed on 12/12/91, arbitrarily, by the Head Varsity Coach, William Farrell, to a lower overall evaluation of "Probationary."

*Id.*

Next, the School Corporation changed the evaluation process in the coaching system. Under the previous system, the evaluations were conducted by members of the management. In the new system, the evaluations were conducted by the head coach of the various sports. Therefore, under the new system, Farrell directly evaluated the plaintiff, and the plaintiff filed a grievance over the "quite critical evaluation." *Id.* at 21. The *School Corporation* "acknowledged that the new system violated state labor law and that all of evaluations ... were void." *Id.*

Finally, the plaintiff filed a Complaint in this court, and filed another retaliation charge with the EEOC. While these actions were pending, Mr. John Byers, the athletic coordinator for Edison Middle School, convened a coaches meeting at Barnaby's Restaurant. Based on the meeting, Mr. Byers decided to remove coach Clarke Dippell ("Dippell") (a defendant in this case) from serving as the plaintiff's assistant coach. The plaintiff's description of this meeting suggests that the meeting was not productive and added to the continuing cycle of hostility in this case.

In considering the viability of the plaintiff's hostile environment claim, it is important to note that the *Vinson* Court indicated that harassment is actionable if it is "sufficiently severe or pervasive 'to alter the conditions of employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405. In *Drez v. E.R. Squibb & Sons, Inc., supra,* the court evaluated whether the Supreme Court's opinion in *Vinson* applied to an action based on the ADEA for purposes of adverse action and a hostile environment. The *Drez* court found that the ADEA could support a hostile environment claim in light of *Vinson.* More importantly, in evaluating the defendant's "conten[tion] that the evidence was legally insufficient to support a verdict in plaintiff's favor on the issue of retaliation[,]" the *Drez* court explained that "the trial included evidence concerning harassment, criticism, and confrontation on the job after the charge was filed." *Id.* In addition, the *Drez* court explained that "after plaintiff filed his charge of discrimination, one of the defendant's supervisory personnel dictated a memorandum to plaintiff's file stating that plaintiff was an 'absolute moron.'" *Id.* Many of the actions contributing to the hostile environment in *Drez* are alleged in this action. Therefore, this court finds that the conditions of employment were sufficiently altered to create a hostile environment.

On this issue, this court also notes that the EEOC outlines "the criteria for determining whether an action constitutes unlawful behavior." *See* 58 *Fed.Reg.* 51,266, 51,267. "These criteria are that the conduct: (i) Has the purpose or effect of creating an intimidating, nostile, or offensive work environment; (ii) has the purpose or effect of unreasonably interfering with an individual's work performance; or (iii) otherwise adversely affects an individual's employment opportunities." *Id.* The EEOC also "sets forth the standard for determining whether the alleged harassing conduct is sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or abusive work environment." *Id.* "The standard is whether a reasonable person in the same or similar circumstances would find

the challenged conduct intimidating, hostile, or abusive." *Id.*

The defendants also argue that the plaintiff has not provided a viable "causal link between the protected expression and the adverse action." *See Defendant's Brief in Support of Motion for Summary Judgment* at 8. Specifically, on this issue, the defendants argue that the plaintiff "details dozens of alleged instances of harassment all of which amount to nothing more than personality conflicts between [the plaintiff] and the other coaches." *Id.* The defendants illustrate this argument by numerous references to deposition transcripts. The plaintiff asserts that the elements of a retaliation claim as outlined in *Passer v. American Chemical Society, supra,* are palpable here and makes a very fact intensive argument.

■ On this issue, the court notes that "[r]etaliation cases tend to be factually oriented, focusing on whether the plaintiff has successfully showed a link between the employer action and the protected activity...." *See Larson Employment Discrimination* § 99.70. "A prima facie case of retaliation may be made by showing a proximity in time between the filing of a charge and the negative action." *Id.* In arguing that there is no causal connection here, the defendants only assert that this lawsuit is solely the result of various personality conflicts. This is not persuasive. Undoubtedly, the issue of causation in this matter is essentially a question of intent. This court can not decipher questions of intent on summary judgment. Therefore, while there is no obvious proximity link here, this court notes that the entire relationship between the plaintiff and the defendants contains temporal contingencies. In fact, an historical analysis of the interaction illustrates a troubling and acrimonious relationship. Therefore, this court finds that certain facts and inferences allow for a finding of causation on this matter.

■ This court finds that the plaintiff has presented a viable claim, and "this creates a rebuttable presumption of [retaliation], and the burden of production shifts to the [defendant] to articulate a legitimate nondiscriminatory reason for the [retaliatory actions.]" *McCoy v. WGN Continental Broad-*

*casting Co.* 957 F.2d 368 (7th Cir.1992). "If the employer is successful, the presumption dissolves, and the burden shifts back to the employee to show that the employer's proffered reasons are pretext." *Id.* In determining whether a genuine issue of material fact exists, this court must consider both the substantive law of age discrimination and the accompanying burdens of proof. *Weihaupt v. American Medical Assoc.* 874 F.2d 419, 424 (7th Cir.1989).

■ The School Corporation and the individual defendants (hereinafter "the defendants") maintain that there is a legitimate nondiscriminatory reason for each instance of alleged harassment. The defendants provide a legitimate nondiscriminatory explanation for each action listed by the plaintiff in the illustration of his prima facie case.

To reiterate, many of the actions of alleged harassment originate in the following provision contained in the conciliation agreement:

> The parties agree that there shall be no discrimination or retaliation of any kind against the Charging Party, including, but not limited to, *consideration for coaching positions,* because of opposition to any practice declared unlawful under any statute administered by the EEOC or because of the filing of a charge; .... The parties to this conciliation agreement agree that if the Charging Party wishes to apply for a coaching position, he will be considered for the position on the same basis as any other candidate who may apply for the position.

*See Conciliation Agreement* (emphasis added).

A critical part of the plaintiff's harassment claim relates to the comments of Mr. Charles Lennon. The plaintiff indicates that Mr. Lennon stated that "[i]t will be a cold day in hell before Gene Eggleston coaches in this system." *See Defendant South Bend Community School Corporation's Reply Brief in Support of Motion for Summary Judgment* at 6. On this issue, the defendants indicate that "this comment was not motivated by the age discrimination claims," but rather was motivated by Mr. Lennon's concern about the plaintiff's violent and inappropriate conduct towards referees during games. *Id.*

According to Mr. Lennon, the plaintiff was "[r]anting, raving, screaming, eyes bulging at the officials." *Id.* Finally, the defendants argue that "[t]he undisputed evidence is that as a result of this personal experience with the plaintiff, Mr. Lennon determined that from his perspective, this was not the type of coach he wished to see in the South Bend Community Schools." *Id.* In contrast, the plaintiff points to the affidavit of Ms. Trudy McManama, a fellow member of the School Board, who was present at the meeting where Mr. Lennon made this statement. In the affidavit, Ms. McManama stated the following:

> The subject was Eugene Eggleston and [the] present status of the charge filed with the EEOC was being discussed. I remember distinctly, a comment made by Chuck Lennon, School Board member regarding Mr. Eggleston. That comment (paraphrased) was; "It will be a cold day in hell before Gene Eggleston coaches in this system." I interpreted Chuck's comment to mean that Mr. Eggleston would never receive a High School head varsity football coaching position as long as Chuck was on the Board.

*See Affidavit of Trudy McManama in Opposition to Defendants' Motions for Summary Judgment.* This court. notes that Ms. McManama's interpretation of the comments contains no indication that Mr. Lennon's comments were based on the plaintiff's treatment of referees. In addition, the plaintiff points to the affidavit of Mr. Joseph Hardiman, a Supervisory Investigator for the EEOC. In his affidavit, Mr. Hardiman indicates:

> ... I distinctly recall Ms. McManama telling me that she personally heard Charles Lennon, while both he and she were sitting in an executive session of the South Bend Community School Board in the presence of other members of the school board say words to the effect; "It will be a cold day in hell before Gene Eggleston coaches in this system." It is also my distinct recollection that Ms. McManama went on to say to me that she interpreted Mr. Lennon's statement to mean, "that Mr. Eggleston would never receive a high school head varsity football coaching position as long as Chuck (Lennon) was on the Board."

*See Affidavit of Joseph M. Hardiman, III in Opposition to Defendants' Motions for Summary Judgment.*

The defendants maintain that there are legitimate nondiscriminatory reasons for every incident of retaliation alleged by the plaintiff. For purposes of the first evaluation incident, the defendants maintain that "[t]he undisputed evidence is that this evaluation simply represents an attempt by the plaintiff's direct supervisor, Coach Farrell, to record his dissatisfaction with the plaintiff's coaching performance." *See Defendant's Reply Brief* at 9. The defendants further maintain that "Mr. DeVault originally executed the December, 1991, evaluation, however, he believed that Coach Farrell should have some input into the evaluation because of the problems between Coach Farrell, the assistant coaches, and the plaintiff." *Id.* Accordingly, Farrell added his comments onto the evaluation. "This was done with all coaches and assistant coaches, not just with the plaintiff." *Id.*

As to the other incidents, the defendants assert that "the middle school coaching position allegations are similarly unrelated to the plaintiff's discrimination complaints." *Id.* The defendants argue that "Farrell had six coaches to run the middle school program, and [he had to] divide[ ] them up in a way he felt was appropriate between the Seventh and Eighth grade teams." *Id.* On the issue of having Farrell evaluate the plaintiff directly, the defendants contend "[t]his change in evaluation policy was systemwide and had absolutely nothing to do with the plaintiff's age discrimination complaints." *Id.*

Finally, on the Barnaby's meeting called by Mr. Byers, the athletic coordinator for Edison Middle School, the defendants maintain that "[t]he dispute at Barnaby's is simply unrelated to the plaintiff's age discrimination complaints." *Id.* "The undisputed evidence is that the meeting was held at Barnaby's to organize the spring 1993 football program [and] the plaintiff objected to the structure of the program." *Id.* The plaintiff indicates that in his affidavit, Mr. Byers explained that following the confrontation at Barnaby's, he warned Farrell "that

[he] should talk to his associates (Dippell, Clarke, and Boehm) 'because they were opening up themselves to a charge of harassment.'" *Id.* at 23. The plaintiff asserts that "[t]he invidious attention imposed on [the plaintiff's] coaching is punctuated by Mr. Byers' observation in ... his affidavit as to the Adams coaching staff's lack of interest in the middle school's football program demonstrated in the fall of 1993 when [the plaintiff] was no longer available to coach, as compared with the 'micro-management' that had occurred before." *Id.*

This court finds that there is a material issue of fact in dispute for purposes of the defendants' legitimate nondiscriminatory reasons pertaining to the incidents involving Mr. Lennon and the School Board meeting and the Barnaby's incident. It is clear that the events and incidents in this matter represent a cycle of animosity, which have built up over several years. Perhaps the most important actions for this court to focus on occurred early on in the process. These actions must be scrutinized for any retaliation. Oftentimes the actions, affinities, and animosities of supervisors affect the rank and file.

On the remaining issues, the defendants' various legitimate nondiscriminatory reasons are plausible to this court. The *McDonnell Douglas* process mandates "[i]f the employer is successful, the presumption dissolves, and the burden shifts back to the employee to show that the employer's proffered reasons are a pretext." *McCoy, supra.* The employee may make this showing of pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Mechnig v. Sears, Roebuck, & Co.,* 864 F.2d 1359 (7th Cir.1988). This court finds that most of this retaliation case depends on the motivations and intent of the various defendants. Perhaps this entire case requires that this court weigh the credibility of various witnesses and defendants. This court can not do so on summary judgment. Therefore, insofar as there is an issue of material fact in dispute on two incidents and several issues which require credibility deter-

minations, this court DENIES summary judgment on the ADEA retaliation claim.

■ In this action, assuming *arguendo,* a finding of liability under the retaliation provision of the ADEA, the plaintiff seeks compensatory and punitive damages. The issue, as stated by the plaintiff, is whether "an employee who successfully charged his employer with age discrimination thereafter incurr[ing] retaliatory harassment such that he suffered personal injury ..., but where his wages were not terminated or reduced, [can] seek monetary damages for such injury under the ADEA." *See Plaintiff's Memorandum in Opposition to Defendants' Motions for Summary Judgment* at 29. On this issue, the plaintiff asserts that the remedial statutory scheme of the ADEA in light of two recent Seventh Circuit opinions in *Moskowitz v. Trustees of Purdue University,* 5 F.3d 279 (7th Cir.1993), and *Travis v. Gary Community Mental Health Center, Inc.,* 921 F.2d 108, 112 (7th Cir.1990), mandates compensatory and punitive damages for retaliation under the ADEA. In addition, the plaintiff argues that the Supreme Court opinion in *Franklin v. Gwinnett County Pub. Schools,* —— U.S. ——, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), provides a basis for allowing "all appropriate remedies," and therefore, this plaintiff must be allowed to pursue compensatory and punitive damages under the ADEA.

The defendants argue that "[a]ny compensatory or punitive damages sought under the ADEA, notwithstanding the dicta in *Moskowitz* are unavailable based on *Espinueva v. Garrett,* 895 F.2d 1164, 1165 (7th Cir.1990) and thus the plaintiff is not entitled to any legal relief." *See Defendant's Reply Brief* at 12. The defendants maintain that "every Circuit in the United States has rejected the proposition urged by the plaintiff, i.e. that compensatory and punitive damages are available under the ADEA." *Id.* The defendants refer specifically to *Johnson v. Al Tech Specialties Steel Corp.,* 731 F.2d 143 (2nd Cir.1984), and *Bruno v. Western Elec. Co.,* 829 F.2d 957 (10th Cir.1987).

■ This court notes that "[t]he ADEA is in some sense a hybrid of Title VII and the Fair Labor Standards Act ("FLSA") of 1938; the prohibitions in the ADEA generally fol-

low Title VII, but the remedies are those of the FLSA." *Schlei and Grossman, Employment Discrimination Law* at 525–27. "Neither the original Act nor the 1978 amendments explicitly addresses the issue of compensatory damages for pain and suffering." *Id.* While most courts considering this issue conclude that compensatory damages for pain and suffering are not recoverable under the ADEA, "[t]here is nevertheless some dissonance among and within the district courts in the other circuits." *Id.*

In determining that compensatory damages are not recoverable, courts "have reasoned that selective incorporation of certain enforcement provisions of the FLSA into the relief provisions of the ADEA limits the relief available." *Id.* In so doing, the "courts have concluded that since compensatory damages are not recoverable under the FLSA and would be inconsistent with the EEOC processes for enforcement of the ADEA, no compensatory damages should be allowed under the ADEA." *Id.* In addition, "these courts have warned that recoverability under the ADEA of the full panoply of tort remedies could interfere with the EEOC's efforts to reconcile informally the parties through conciliation by creating an incentive for bypassing the administrative processes, since the plaintiff would be more interested in the possibility of large jury awards than in good faith negotiations with the defendant.[3]" *Id.*

On this issue, the defendants maintain that *Espinueva v. Garrett, supra* is dispositive on this issue. In *Espinueva,* the Seventh Circuit, speaking through Judge Easterbrook, explained that "[n]either Title VII nor the ADEA authorizes awards of compensatory or punitive damages, as opposed to 'equitable' relief such as reinstatement and back pay." *Id.* at 1165 (citations omitted). In addition, the defendants maintain that the "argument presented by the plaintiff regarding the interaction of the ADEA and the FLSA is hardly new, and has been rejected in *Johnson v. Al Tech Specialties Steel Corp., supra.* In constructing this argument, the defen-

dants include an excerpt from the Second Circuit, speaking through Judge Kaufman, in *Johnson v. Al Tech Specialties Steel Corp., supra:*

> Johnson asserts that an ADEA provision authorizing "such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation [injunctive relief]," 29 U.S.C. § 626(b), permits compensatory damage awards. A few district courts, including at least one in this Circuit, have permitted such awards. *See, e.g., Flynn v. Morgan Guaranty Trust Co.,* 463 F.Supp. 676 (E.D.N.Y.1979). The statutory language containing the seemingly expansive remedial authority, however, also provides for enforcement "in accordance with the powers, remedies, and procedures" of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.,* which does not provide for compensatory damages. The statutory provision in question further states that "[a]mounts owing ... as a result of a violation ... shall be deemed to be unpaid ... wages." 29 U.S.C. § 626(b). Under accepted principles of statutory construction, we consider this specific indication to be dispositive of the drafters' intentions. *See* 2A *Sutherland, Statutory Construction* § 46.05 at 57 (1973). The more expansive grant of judicial authority relied upon by Johnson permits courts in their discretion to supplement back pay awards with injunctive relief, orders of reinstatement or promotion, or similar non-monetary remedies designed to "effectuate the purposes of [the ADEA.]" 29 U.S.C. § 626(b).

*Id.*

While this court notes that compensatory damages have not been favored under the remedial scheme of the ADEA, the Seventh Circuit has crafted an exception to this rule in *Moskowitz v. Trustees of Purdue University, supra,* and *Travis v. Gary Community Mental Health Center, Inc., supra.* In *Travis,* the Seventh Circuit, speaking through Judge Easterbrook, considered the remedies

---

**3.** In the Civil Rights Act of 1991, Congress changed the remedial structure of Title VII and plaintiffs may seek compensatory damages in cases alleging intentional race, color, religion, sex, or national origin discrimination or retaliation against opponents for such discrimination under Title VII of the Civil Rights Act of 1964.

for a retaliation claim under the FLSA. In *Travis,* after appearing as a witness in another employee's employment case, the plaintiff was fired while on leave expecting a child. *Id.* "[The plaintiff in *Travis*] suffered little loss in wages, because the firing caused such a ruckus within the [the employee's office] that [the] managers reinstated her within two months." *Id.* The plaintiff was awarded compensatory and punitive damages "for emotional distress attributable to the discharge...." *Id.* The *Travis* court discussed the statutory remedial scheme of the FLSA as enacted in 1938 and in light of Congressional amendments in 1977. The *Travis* court specifically referred to the section of the FLSA dealing with retaliation in 29 U.S.C. § 215(a)(3), and held that "[a]ppropriate legal relief includes damages." *Id.* The *Travis* court held that "Congress could [have] limit[ed] these damages, but the 1977 amendment does away with the old limitations without establishing new ones." *Id.* Finally, the *Travis* court held "[c]ompensation for emotional distress, and punitive damages, are appropriate for intentional torts such as retaliatory discharge" under the FLSA. *Id.*

In *Moskowitz v. Trustees of Purdue University,* 5 F.3d 279 (7th Cir.1993), the Seventh Circuit, speaking through Judge Posner, evaluated the remedial scope of the ADEA. In analyzing this issue, the court explained that "[t]he age discrimination law authorizes the courts to grant 'such legal or equitable relief as may be appropriate to effectuate the purposes' of the law." *Id.* Here, the court indicated that the plaintiff "incurred no loss of earnings or benefits as a result of the alleged age discrimination." *Id.* In the terms of the ADEA, the plaintiff "is not seeking equitable relief, such as reinstatement, or 'front pay' in lieu of reinstatement when reinstatement is infeasible ... [rather h]e is seeking damages, the standard 'legal' (as distinct from equitable) remedy." *Id.*

On this issue, the *Moskowitz* court concluded "[l]ike other forms of tortious conduct,

age discrimination can cause psychological distress but the cases hold and we do not understand the plaintiff to disagree that the courts are not authorized to grant 'legal relief' to age discrimination plaintiffs." *Id.* (citing *Haskell v. Kaman Corp.,* 743 F.2d 113, 120–21 and n. 2 (2d Cir.1984)). In considering this issue, the *Moskowitz* court explained that:

> The statutory language that we just quoted is broad enough to encompass a claim for such damages—but only when the language is taken out of its context. For immediately after it the statute says that "legal and equitable relief ... includes ... without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section." The mysterious expression—mysterious in a statute concerned with age discrimination rather than with subminimum wages or excessive hours—"amounts deemed to be unpaid minimum wages or unpaid overtime compensation" refers to the fact that the age discrimination law incorporates the remedies and procedures of the Fair Labor Standards Act. Specifically, "amounts owing to a person as a result of a violation of [the age discrimination law] shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of" the remedial provisions of the FLSA. 29 U.S.C. § 626(b). The only "legal" relief specified in the "includes ... without limitation" provision of section 626(b) is an award of "amounts owing to a person as a result of a violation," *Lorillard v. Pons,* 434 U.S. 575, 583 [98 S.Ct. 866, 871–72, 55 L.Ed.2d 40] (1978), and the natural way to take this language is as referring to amounts such as wages or benefits that the employer should have given the employee but did not because of the latter's age. That would exclude the consequential damages sought here. *Cf. Pfeiffer v. Essex Wire Corp.,* 682 F.2d 684, 687–88 (7th Cir.1982).[4]

---

**4.** The court also considered the meaning of "without limitation" in the ADEA remedial statute. The court considered whether this language

was indicative of a Congressional intent to allow other form of legal relief. On this issue, the court explained that "[i]f Congress wanted to

*Id.* Finally, the court concluded that "[t]hese cases show that 'without limitation' is not to be taken literally when the issue is whether to award legal relief that is novel by the standards of the Fair Labor Standards Act." *Id.*

This court notes that the most important part of the *Moskowitz* opinion and perhaps the most dispositive argument on this issue is contained in this excerpt by Judge Posner:

> An exception to the narrow construal of "legal relief" has been recognized for the case in which the plaintiff charges that he was retaliated against for exercising his rights under the age discrimination law. 29 U.S.C. § 623(d); *see Passer v. American Chemical Society,* 935 F.2d 322, 330–31 (D.C.Cir.1991). In *Travis v. Gary Community Mental Health Center, Inc.,* 921 F.2d 108, 112 (7th Cir.1990), we treated this provision as creating a tort for which the usual common law damages can be obtained. *See also Soto v. Adams Elevator Equipment Co.,* 941 F.2d 543, 551 (7th Cir.1991). These cases do not cite *Pfeiffer* or the other decisions which hold that common law damages are not available in suits under the age discrimination law. The tension between the two lines of cases is, however, superficial. *Travis* and *Soto* rely on a specific amendment to the provision of the Fair Labor Standards Act regarding retaliation, an amendment that appears to make clear that Congress meant to enlarge the remedies available for such misconduct beyond those standardly available for FLSA (and ADEA) violations.

*Id.*

In arguing that compensatory damages are not within the remedial structure of the ADEA, the defendants maintain that the *Moskowitz* court outlines this same precept by reference to *Pfeiffer v. Essex Wire Corp.,*

682 F.2d 684, 687–88 (7th Cir.1982), and *Haskell v. Kaman Corp.,* 743 F.2d 113, 120–121 (2d Cir.1984). The defendant maintains that "Judge Posner was faced with the contradictory holding of Judge Easterbrook in *Travis* allowing compensatory and punitive damages in an FLSA case, and harmonizing this holding with all of the ADEA cases holding that no consequential damages were available under the ADEA." *See Defendant's Reply Brief* at 21. The defendants maintain that an entire paragraph of Judge Posner's opinion is dicta unnecessary to the decision and is in existence solely as an attempt by Judge Posner to reconcile those cases. *Id.*

This court disagrees with the defendants' argument. The last sentence of this excerpt in Judge Posner's opinion in *Moskowitz* is dispositive on this issue. First, Judge Posner specifically references *Travis, supra,* and also refers to *Soto v. Adams Elevator Equipment Co.,* 941 F.2d 543, 551 (7th Cir.1991). In *Soto,* Judge Ripple reversed a district "court's judgment striking [a] jury's damages award on the [Equal Pay Act] retaliation claim...." *Id.* The *Soto* court based their decision on *Travis* and the fact that the plaintiff in *Travis* "has alleged retaliation in violation of section 215(a)(3) of the FLSA.[5] Most importantly, the *Moskowitz* court specifically referred to the opinion in *Passer,* and clarifies this "narrow construal of 'legal relief' has been recognized for the case in which the plaintiff charges that he was retaliated against for exercising his rights under the [ADEA.]" *Id.* This is *not* dicta.

In addition, this court also notes the proposition that legal damages of this nature may skew the equitable nature of the ADEA statute. The EEOC begins this process by attempting to "reconcile informally the parties through conciliation." *Schlei and Grossman, Employment Discrimination Law* at 525–27. Therefore, the argument contends that "by creating an incentive for bypassing the ad-

---

grant age discrimination plaintiffs full rights to common law damages, why did it use as its remedial template the Fair Labor Standards Act?" *Id.* In response to this rhetorical question, the court maintained that "[t]The phrase "without limitation" invites courts to be imaginative in the devising of equitable remedies; the invention of front pay is an example[; however, i]t does not invite the courts to undo the limita-

tions that the Fair Labor Standards Act places on nonequitable relief." *Id.*

**5.** It is important to note that "[a]s relevant to [the] *Travis'* case, section 215(a)(3) forbids retaliation for testifying in a [FLSA] action." *Soto, supra* at 551 n. 12. "The EPA is contained within the FLSA as amended." *Id.*

ministrative processes, ... the plaintiff would be more interested in the possibility of large jury awards than in good faith negotiations with the defendant." *Id.* This is apt for most actions pursuant to the ADEA except for those centering on retaliation.

■ The plaintiff is also seeking punitive damages, and seeks to do so under the abovementioned authority. However, while this court finds support for compensatory damages in the authority, this court does not find that the ADEA allows for punitive damages. In *Lorillard v. Pons*, 434 U.S. 575, 582, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978), the Supreme Court stated that "but for those changes Congress expressly made, it intended to incorporate fully the remedies and procedures of the FLSA [into the ADEA.]" *Id.* However, the Congress made it clear that punitive damages were not among the remedies available under the ADEA notwithstanding the expansive language of the remedial section of the statute. In fact, "[a] final indication that Congress did not envision punitive damage recoveries is the legislators' statement, made when the ADEA was amended in 1978 to ensure the availability of jury trials on liquidated damages claims, that 'the ADEA as amended by this act does not provide remedies of a punitive nature.'" *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143 (2nd Cir.1984) (citing *H.R.Rep. No. 950*, U.S.Code Cong. & Admin.News, 1978, p. 535.). In addition, while courts have diverged on this issue of compensatory damages under the ADEA, most courts have been resilient on this issue of punitive damages. *Id.* at 148 n. 3. *See also Espinueva v. Garrett*, 895 F.2d 1164, 1165 (7th Cir.1990) (concluding that punitive damages are not available under the ADEA). The plaintiff maintains that *Franklin v. Gwinnett, supra*, mandates the availability of punitive damages in this ADEA action. In so doing, the plaintiff quotes the following language from *Franklin:* [A]lthough we examine the text and history of a statute to determine whether Congress intended to create a right of action, we presume the availability of all appropriate remedies *unless Congress has expressly indicated otherwise. Id.* Here, Congress has expressly held that punitive damages are *not* available under the ADEA.

Therefore, this court finds that the plaintiff has a viable claim based on the retaliation provisions in the ADEA. This court DENIES summary judgment to the South Bend Community School Corporation and William Farrell. This court GRANTS summary judgment to the remaining defendants: Clarke Dippell and Christopher Clarke. There is insufficient evidence for purposes of summary judgment to find liability under the ADEA for purposes of these two individual defendants. In addition, in pursuing this claim, the plaintiff may seek compensatory, but *not* punitive damages.

## IV.

■ The plaintiff also asserts a state claim based on the intentional infliction of emotional distress. In constructing this claim, the plaintiff utilizes the same facts at issue for purposes of the ADEA retaliation claim. On this issue, the defendants assert that the tort of intentional infliction of emotional distress is barred by the Indiana Worker's Compensation Act. Specifically, the defendants point to the Act's exclusivity provision, *Indiana Code* 22–3–2–6, which provides:

> The rights and remedies granted to an employee subject to IC 22–3–2 through IC 22–3–6 on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, his personal representatives, dependents or next of kin, at common law or otherwise, on account of such injury or death, except for remedies available under IC 5–2–6.1 (dealing with violent crime victims).

*See Indiana Code* 22–3–2–6.

In constructing this argument, the defendants argue that the most dispositive case on this issue is *Fields v. Cummins Emp. Fed. Credit Union*, 540 N.E.2d 631 (Ind.App. 1989). In *Fields*, the plaintiff "alleged that [her supervisor] subjected her to sexual harassment" on numerous occasions. *Id.* In addressing this issue, the *Fields* court, speaking through Judge Miller, explained that "[o]ur supreme court has held that the Workmen's Compensation Act excludes all rights and remedies of an employee against

[an] employer for personal injury or death where the following three statutory jurisdictional prerequisites are met: (1) personal injury or death by accident; (2) personal injury or death arising out of employment; and (3) personal injury or death arising in the course of employment." *Id.* (citations omitted). The *Fields* court also explains that:

An injury is "by accident" when "the sufferer did not intend or expect that injury would on that particular occasion result from what he was doing." An injury "arises out of" the employment relation when it has been caused by employment related risks. An injury "arises in the course of" employment when the time, place, and circumstances of the injury were not so remote from the purposes of the claimant's employment that the act in which he was engaged when the injury occurred must be considered one for the claimant's benefit only.

*Id.* (citations omitted).

In *Fields,* the plaintiff argued that the injuries complained of were not "by accident" insofar as the "initial assault may have been unexpected, the repeated assaults lost their unexpected characteristics and ceased to be accidental." *Id.* In evaluating whether "this language ... requir[es] an injury to result from a single occurrence in order to be considered accidental," the *Fields* court explained that "... this interpretation is not supported by the decision in *Hansen* [*v. Von Duprin, Inc.* 507 N.E.2d 573 (Ind.1987) ]." *Id.* In addition, the *Fields* court explained:

In *Hansen,* the plaintiff "suffered numerous emotional and physical problems, including a gunshot wound inflicted by her former husband...." *Id.* at 574. As a result of the gunshot wound, she developed a fear of guns. Her immediate supervisor repeatedly played jokes on her by simulating the sound of gunfire by dropping books, or firing a cap pistol. He would also jab her in the ribs from behind as if holding a gun. She became increasingly anxious and depressed. Finally her supervisor made a comment which caused her to become hysterical. She left work and was unable to return due to a condition diag-

nosed as "severe anxiety and depressive syndrome." *Id.* The Industrial Board found the plaintiff's injury arose out of her employment, *and was caused by various acts of her foreman, which did not occur on a single occasion, but was not an accident as defined under the Workmen's Compensation Act. The Supreme Court reversed the Board's finding that the injury was not an accident,* and held the Board's finding the injury arose out of the employment was supported by evidence of probative value. We see no distinction between the repeated harassment in *Hansen* and the harassment in this case. Therefore, we conclude Fields's injuries were "by accident."

*Id.* Much like the plaintiff in *Fields, supra,* who was subjected to numerous incidents of harassment by her supervisor; here the plaintiff was subjected to numerous incidents of harassment as well. The court in *Fields* found that this constituted "by accident" for purposes of the Worker's Compensation Act. This court finds that logic persuasive.

Although the opinion in *Fields* is dispositive, the plaintiff argues that the opinion in *Perry v. Stitzer Buick, GMC, Inc.,* 604 N.E.2d 613 (Ind.App.1992), provides the authority which allows the plaintiff to sue both the School Corporation and the individual defendants. In *Perry,* the court explained that " 'it would be a total perversion of the humanitarian purposes of the [Worker's Compensation] Act to permit an employer to use the Act as a shelter against liability for an intentional tort.' " *Id.* at 617 (quoting *National Can Corp. v. Jovanovich,* 503 N.E.2d 1224 (Ind.App.1987).

In *National Can Corp., supra,* the court considered whether the plaintiff's "injuries were 'by accident' as required by IC 22–3–2–6, and hence, within the Workmen's Compensation Act." *Id.* In evaluating whether the Act applies if an employer intentionally injures an employee, the *National Can Corp.* explained that an employer can not use the Act to avoid accountability for an "intentional tort, and therefore, the trial court had jurisdiction to entertain a claim alleging an intentional tort." *Id.* In order to effectuate this

claim, the *National Can Corp.* court also indicated that:

> While we find that [the plaintiff's] claim is beyond the scope of the Workmen's Compensation Act, it nevertheless must fail, as a matter of law, for failure to satisfy the *specific intent* requirement necessary to prevail on a claim of intentional employer misconduct outside the operation of the statute. *While it must be proven that the supervisory employee acted as the alter ego of the corporation or acted upon direct orders from those in control of the corporation, it must also be proven that the employer had an actual intent to cause the harm complained of.* ... Dean Prosser distinguished the requisite specific intent underlying an intentional tort and negligence:
>
> > "[T]he mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent. The defendant who acts in the belief of consciousness that he is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but is not classed as an intentional wrong. In such cases the distinction between intent and negligence obviously is a matter of degree. Apparently the line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable man would avoid, and becomes a certainty." (citations omitted). (emphasis added).

*Id.*

This court notes that the factual background of *National Can Corp.* is very similar to the facts at issue here:

> The record shows that both [the plaintiff] and National Can were fully advised, pursuant to [a doctor's] letter, that [the plaintiff] could perform his "regular job" according to his tolerance for pain. [The plaintiff] produced testimony at trial showing National Can's *animosity toward him because of his union activities, mainly filing of grievances. [The plaintiff] also provided substantial evidence showing National Can's desire to force [the plain-*

*tiff] to quit his job or to force him to withdraw certain grievances, or both.* [The plaintiff] even presented evidence that his "heavy work" assignments came from high-level supervisors. We believe, in viewing the evidence in the light most favorable to [the plaintiff], that this evidence as a matter of law *fails to show either the necessary intent on the part of National Can or the direct causative connection necessary for an intentional tort.* (emphasis added).

*Id.*

In holding that the plaintiff "failed to satisfy the requirements necessary to successfully recover in an action outside the Workmen's Compensation Act," the *National Can Corp.* court explained that "[w]e see no problem in holding the employer liable for torts he directs or expressly authorizes against his employees." *Id.* The *National Can Corp.* court indicated "[c]ourts fail, however, to explicitly distinguish those cases from incidents where the intentional tort is committed not by the employer personally, but by a foreman or supervisor." *Id.* "Although the foreman may be personally at fault, it does not follow that his moral culpability can be shifted to the employer by simple reliance on the doctrine of respondeat superior." *Id.* "It must be shown that the actor was the employer, one acting pursuant to employer's direct order or one acting as the alter ego of the corporation." *Id.* (citing 2A, *A. Larson, The Law of Workmen's Compensation* (1983), Section 68.22; *Note, Workmen's Compensation Expanding the Intentional Tort Exception to Include Wilful, Wanton and Reckless Employer Misconduct,* 58 *Notre Dame L.Rev.* 890, 899 (1983) ...). This court finds that there is insufficient evidence to find that the School Corporation formed the necessary intent for purposes of this tort.

Finally, and perhaps more dispositively, this court notes that in *Cullison v. Medley,* 570 N.E.2d 27 (Ind.1991), the Indiana Supreme Court evaluated the tort of the intentional infliction of emotional distress outside of the parameters of the Worker's Compensation Act. In *Cullison,* "after exchanging pleasantries" with a 16–year–old female in a grocery parking lot, the plaintiff "invited her

to have a [soda] with him and to come to his home to talk further." *Id.* The female refused. A few hours later, the plaintiff heard "someone knock[ ] on the door of his mobile home." *Id.* Next, the plaintiff "testified that he saw a person standing in the darkness who said that she wanted to talk to him." *Id.* After dressing and "returning to the darkened living room of his trailer," the plaintiff "was confronted by the [16–year–old female] as well as by [her] father, brother, mother, and brother-in-law." *Id.* "[The father] was on crutches due to knee surgery and had a revolver in a holster strapped to his thigh." *Id.* "[The plaintiff] testified that the [16–year–old female] called him a 'pervert' and told him he was 'sick', [the] mother berated him while keeping her hand in her pocket, convincing [the plaintiff] that she also was carrying a pistol." *Id.* The plaintiff further explained that his "attention was riveted to the gun carried by [the father, and] ... that, while [the father] never withdrew the gun from his holster, he 'grabbed for the gun a few times and shook the gun' at plaintiff while threatening to 'jump astraddle' of [the plaintiff] if he did not leave [his daughter] alone." *Id.* The *Cullison* court explained that "[a]lthough no one actually touched [the plaintiff], his testimony was that he feared he was about to be shot throughout the episode because [the father] kept moving his hand toward the gun as if to draw the revolver from the holster while threatening [the plaintiff.]" *Id.*

In affirming the trial court's entry of summary judgment on the intentional infliction of emotional distress claim, the Indiana Supreme Court, speaking through Justice Krahulik, explained:

Count four alleges an intentional infliction of emotional distress. This tort has not been recognized in this state. The definition of the tort of intentional infliction of emotional distress is that "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress...." *Restatement (Second) of Torts* § 46 (1965). It is the intent to harm one emotionally that constitutes the basis for the tort of an intentional infliction of emotional distress. We hold that under proper circumstances, liability will attach to a defendant for an intentional infliction of emotional distress, but the facts in this case do not support a finding that the [the defendants] intended to cause emotional injury to [the plaintiff]. [The plaintiff] points to evidence that the [the defendants] knew that he "disliked" guns and, therefore, argues that a jury could infer from this knowledge that [the father's] wearing of a gun was intended to inflict emotional injury on [the plaintiff]. We believe that this fact, standing alone, cannot be stretched into such an inference without breaking. The trial court properly entered summary judgment on count four of [the plaintiff]'s complaint.

*Id.*

Therefore, in light of the Worker's Compensation Act, and the fact that the underlying tort of the intentional infliction of emotional distress fails in comparison to *Cullison, supra,* this court GRANTS summary judgment to *all* of the defendants on this issue.[6]

## V.

These rulings have left the courthouse door open on some narrow but important slices of this plaintiff's claims. The burden of convincing the trier of fact with convincing proof remains and is by no means insured even when in the able and professional hands of an experienced advocate. Trials, and especially jury trials, always involve great risks. The unknown and unexpected are often the order of the day. This plaintiff remains a long way from sustaining his burden of persuasion and proof here. Even if such are sustained, there is always the chance that a panel of the Court of Appeals will perceive some species of error which will undo the best laid plans of counsel.

The very able and experienced counsel here should take a hard realistic look at the

---

**6.** In light of this holding, this court also finds that the dispute over the effect of *Indiana Code* § 34–4–16.5–7(a) is moot.

total posture of this litigation and take full advantage of the proffered services of Magistrate Judge Robin D. Pierce to participate in a full-blown settlement conference very soon.

This case is now set for jury trial in South Bend, Indiana, on Tuesday, August 30, 1994 at 1:30 p.m. **IT IS SO ORDERED.**